## EDWARDS, COLLECTOR, *v.* DOUGLAS ET AL., EXECUTORS.

### CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 129. Argued April 17, 1925.—Decided November 23, 1925.

Section 31 (b), added by the Revenue Act of 1917 to the Revenue Act of 1916, provides: "Any distribution made to the shareholders . . . of a corporation . . . in the year nineteen hundred and seventeen, or subsequent tax years, shall be deemed to have been made from the most recently accumulated undivided profits or surplus, and shall constitute a part of the annual income of the distributee for the year in which received, and shall be taxed to the distributee at the rates prescribed by law for the years in which such profits or surplus were accumulated by the corporation, . . . but nothing herein shall be construed as taxing any earnings or profits accrued prior to March first, nineteen hundred and thirteen. . . ." Construing this, *Held:*

1. Where the net profits of a corporation, during the fiscal year in which dividends are paid, are sufficient to cover such dividends, the term "most recently accumulated undivided profits" applies to such current earnings, and the dividends must be deemed to have made from them and are subject to the income tax rates of that year, although, when the distribution was made, there were other funds, adequate to meet it, carried in the surplus account of the corporation, as made up to the end of the preceding fiscal year. Pp. 207, 215, 217.

2. The term "surplus" as employed in corporate finance and accounting, designates an account on the books, representing the net assets of the corporation in excess of all liabilities, including its capital stock. P. 214.

3. As used in § 31 (b) *supra,* "surplus" means that part of the surplus which was derived from profits, which, at the close of earlier annual accounting periods, were carried into the surplus account as undistributed profits. *Id.*

4. "Undivided profits" has not acquired a fixed meaning in corporate finance and accounting; in § 31 (b) *supra,* there is reason to conclude, it refers to profits which have neither been distributed as dividends nor carried to surplus account upon the closing of the books,—that is, to current undistributed earnings. P. 214.

5. The general aim of Congress, when enacting the above legislation, was to make the dividend, in whatever year paid, bear the tax rate of the year in which the profits of which it was a distribution had been earned, and for this purpose to treat as a unit the profits of the whole tax year; coupled with which was the special aim of making the war profits pay the high war taxes, to which end it was essential that the law, in determining the applicable tax rate, should neither accept any declaration of the corporation as to what year's profits were being distributed, nor adopt the earliest year (since March 1, 1913) of which there were accumulated profits available for distribution. P. 216.

298 Fed. 229, reversed.

CERTIORARI to a judgment of the Circuit Court of Appeals which reversed a judgment of the District Court adverse to the plaintiffs, Douglas et al., in their action to recover from the defendant Edwards the amount of an income tax assessment which they paid to him, as Collector, under protest. See 287 Fed. 919.

*Mr. Alfred A. Wheat,* Special Assistant to the Attorney General, with whom *Solicitor General Beck* and *Mr. Richard S. Holmes,* Special Assistant to the Attorney General, were on the brief, for petitioner.

*Messrs. Matthew C. Fleming* and *Paul Armitage,* with whom *Messrs. Archibald Douglas* and *Edward Holloway* were on the brief, for respondents.

MR. JUSTICE BRANDEIS delivered the opinion of the Court.

Section 31 (b), added by § 1211 of the Revenue Act of 1917, c. 63, Title XII, 40 Stat. 300, 338 to the Revenue Act of 1916, provides: "Any distribution made to the

shareholders . . . of a corporation . . . in the year nineteen hundred and seventeen, or subsequent tax years, shall be deemed to have been made from the most recently accumulated undivided profits or surplus, and shall constitute a part of the annual income of the distributee for the year in which received, and shall be taxed to the distributee at the rates prescribed by law for the years in which such profits or surplus were accumulated by the corporation, . . . but nothing herein shall be construed as taxing any earnings or profits accrued prior to March first, nineteen hundred and thirteen. . . ."

James Douglas received from Phelps Dodge Corporation in September and December, 1917, two dividends, called at the time " depletion dividends," aggregating $328,400. He, and later his estate, claimed that these dividends were not taxable because they were a return of capital, not income. The Commissioner of Internal Revenue insisted that they were taxable, and assessed the tax at the 1917 rate. It amounted to $173,579.72. The estate paid the tax under protest, and brought, in the federal court for southern New York, this suit against the Collector to recover the full amount so paid. The contention was repeated that the dividends were not taxable because not constituting income. In addition, it was claimed that, if they were taxable at all, it was not at the 1917 rate, but at the rate for 1916. The income tax rate imposed upon individuals for the calendar year 1917 by the 1917 Revenue Act was much higher than that imposed for the year 1916 by the Act of September 8, 1916, c. 463, Part I, 39 Stat. 756. The District Court concluded that the dividends were income and that they were taxable at the 1917 rate. It entered judgment for the Collector. 287 Fed. 919.

This judgment was reversed by the Circuit Court of Appeals. It agreed with the District Court that the dividends were not a distribution of capital. But it found

that there was on hand on December 31, 1916, in the surplus account, a balance of profits earned in that year amply sufficient to enable the corporation to pay these dividends out of such surplus; held that by reason thereof the dividends received by Douglas should have been taxed under § 31 (b) at the 1916 rate; and ordered that a mandate issue directing the District Court, upon a new trial, to enter judgment for the Douglas estate in accordance with its conclusions. 298 Fed. 229. This Court granted a writ of certiorari. 266 U. S. 596. The assertion of the estate that the dividends were a distribution of capital was not renewed in this Court; and the character assigned to the dividends by the corporation was treated here as of no legal significance. The sole question requiring decision[1] is whether these dividends paid in 1917 shall be deemed to have been paid out of the earnings of that year or out of an accumulated surplus built up in 1916 and earlier years. The question does not concern the corporation. The stockholder is interested only because he is an income tax payer.

The Government contends that the phrase "most recently accumulated undivided profits or surplus" in § 31 (b) includes current earnings of the year in which the dividends are paid; and that, as the earnings of 1917 were ample to pay these dividends, the 1917 dividends are conclusively presumed to have been paid out of 1917 earnings. The fiscal year of Phelps Dodge Corporation coincides with the calendar year. The corporation earned in 1917 a net profit of $16,742,487.06. The two distributions here involved amounted to only $3,600,000. The corporation paid from time to time during 1917, in all, ten

---

[1] The estate had also contended that the word "deemed" merely "gave rise to a rebuttable presumption, subject to be rebutted by showing the fund out of which the corporation actually paid the dividend." This contention was denied by both lower courts and was not made in this Court.

dividends aggregating $14,400,000. A large excess remained, to be added to the surplus account on closing the books as of December 31, 1917. There was no suggestion by the Douglas estate that, when these dividends were paid, the current undistributed 1917 earnings of the corporation then accrued were in fact insufficient to pay the two dividends. The District Court found that, under a *pro-rata* apportionment, they were " more than sufficient." It is not suggested that the approximate amount of the undivided current earnings of 1917 accrued and undivided at the times these dividends were paid was not in fact known to be sufficient for this purpose. Nor is it suggested by the Douglas estate that the exact facts, or the knowledge thereof by the corporation at the times when the dividends were declared or paid, are of legal significance.

The claim of the Douglas estate is that the current profits are not, within the meaning of the Act, the " most recently accumulated undivided profits or surplus," from which the distributions " shall be deemed to have been made;" and that what Congress intended was that a dividend should be deemed to have been paid from the most recent accumulation of profits which, before payment of the dividend, appeared on the books as having been added to the undivided profits or surplus account of a fiscal year. The argument is that the income tax is levied generally with reference to the period of a full year; that the net financial results of the full calendar and fiscal year of a corporation cannot be known until the expiration of the fiscal year; that the words used by Congress have in corporate accounting a well known technical meaning; that this meaning is earnings which have been determined by the taking of inventories and the balancing of books to constitute " undivided profits or surplus "; that it was after December 31, 1917, before the net financial results of the operations of that year were formally and

definitely determined by this corporation by the usual taking of the annual inventory, the balancing of the books, and the carrying of the " undivided profits or surplus " to the appropriate account; that the most recently accumulated undivided profits so appearing was the undistributed balance of the profits earned in the year 1916, which was shown on the books as closed under date of December 31, 1916, and appeared in the surplus account; that this balance was sufficient in amount to meet these two dividends; and that it must be deeemd to have been applied in paying them. In short, the claim of the Douglas estate is that Congress, in providing by § 31 (b) that dividends shall be deemed to have been paid " from the most recently accumulated undivided profits or surplus," meant from such balance as, at the time of the payment of the dividend, is shown by the undivided profits or surplus account of the preceding fiscal year.

The Douglas estate, apparently, does not contend that under the 1917 Act dividends are not to be taxed at all unless there was an existing balance of taxable profits in the surplus or undivided profits account from which they can be considered to have been paid. To have so contended would have been to impute to Congress the intention of exempting from taxation the dividends received in 1917 by those individuals who were stockholders in corporations which earned in 1917 large sums and paid them out in dividends during that year,[2] but which had no earned surplus at the close of their fiscal year on De-

---

[2] This, as a business matter, could easily be done, and is, in fact, done by many corporations. Nearly every business with a well developed accounting system can, at any time, without the formal periodic inventory or closing of its books usual at the end of a fiscal year, determine approximately the amount of its current earnings, the amount accrued since the beginning of its fiscal year, and the part thereof undistributed. Many corporations do make such approximate ascertainment of profits monthly, or oftener. And, relying upon their system of cost-accounting, they make distributions of current

cember 31, 1916, or whose earned surplus consisted wholly of profits earned prior to March 1, 1913. The Douglas estate grafts upon the section an implied condition or limitation. Its position seems to be that § 31 (b) applies if, and only if, at the time of the payment of the dividend, there was on hand an undistributed part of the taxable earnings of some prior fiscal year or years. In other words, it asserts that Congress, in providing that a distribution to shareholders should "be deemed to have been made from the most recently accumulated undivided profits or surplus," implied the condition—" if there are such accumulated profits or surplus not exempt from taxation "; that if there are available no such undivided profits or surplus, accrued subsequent to March 1, 1913, the distribution will be considered to have been made from current earnings; that such dividends, in that event, would be taxable as income under § 2 (a) of the Revenue Act of 1916, 39 Stat. 757, as amended by § 1200 of the 1917 Act, 40 Stat. 329; and that the 1917 rates would apply. Whether, at the time these 1917 dividends were paid, there was in the surplus account as of December 31, 1916, such funds sufficient for their payment, as the Court of Appeals appears to have found, we have no occasion to consider. For we are of the opinion that, in any event, the District Court was right in holding that these 1917 dividends must be deemed to have been paid out of the 1917 earnings, and that the stockholder was taxable thereon at the 1917 rate.

The legislative history of § 31 (b) is relied upon by the Douglas estate in support of its construction. On

_____

earnings without a closing of the books, as the Phelps Dodge Corporation did in 1917.

. This is shown by the record to be true of the Phelps Dodge Corporation. It paid during 1917 regular and extra dividends on June 28, on September 28, and on December 28, aggregating $8,100,000, which were declared, in its report to stockholders, to have been paid by it " out of earnings for the year 1917."

the other hand, the Government relies upon the legislative history of the Revenue Act of 1918, Act of February 24, 1919, c. 18, 40 Stat. 1057, passed by the same Congress which enacted the Revenue Act of 1917. Enquiries into the detail of legislative history are sometimes helpful in removing a doubt presented by the language used in a statute. *Penn Mutual Life Ins. Co.* v. *Lederer,* 252 U. S. 523, 537. But we have no occasion here to resort to that aid in construing the phrase in question. To ascertain its meaning, we need only bear in mind the general character of the income tax, the specific practices of corporations concerning profits and dividends, the prior income-tax legislation to which § 31 (b) is an amendment, and the time of the latter's enactment.

Ordinarily, an income tax is laid upon all taxable income actually received during the tax-year and the tax is payable at the tax-rate of the year in which it is received, although none of the income may have been earned by the taxpayer during that year, or, where the income consists of dividends, although the corporation may not have earned in that year any part of the profits of which the dividend is a distribution. The Act of October 3, 1913, c. 16, § II, 38 Stat. 114, 166, the first income-tax law enacted after the adoption of the Sixteenth Amendment, was construed by the Treasury Department as embodying this general rule without any exception. Consequently, the Treasury exacted such payment on account of all income received by the taxpayer after March 1, 1913, the effective date of the Amendment, although it appeared that all of the income had been earned before that date either by the taxpayer or by the corporation whose profits were distributed as a dividend. The correctness of the Treasury's construction was questioned; and before the second income tax law was enacted, September 8, 1916, c. 463, Title I, 39 Stat. 756, lower federal courts had in *Lynch* v. *Hornby,* 236 Fed. 661, held the Treasury

construction to be erroneous. There had also been serious contention that, as construed by the Treasury, the provision was, when applied to dividends, both unconstitutional and unjust.[3] These contentions apparently prevailed with Congress when, in framing the 1916 Act, it raised the normal tax-rate from 1 per cent. to 2 per cent. and the maximum additional tax (super-tax) from 6 per cent. to 13 per cent. The 1916 Act, by a proviso to § 2, limited the tax on dividends to distributions "made or ordered to be made by a corporation . . . out of its earnings or profits accrued since March first, nineteen hundred and thirteen . . ." Soon after came the War; the great need of the Government for large revenues; and the large war-profits. Congress enacted the 1917 War Income Tax law, which raised the normal tax rate to 4 per cent. and the maximum additional tax to 63 per cent.; and it made the provision retroactive, in the main, to January 1, of that year.

While the 1917 Act was under consideration, it was recognized that this rapid increase in the income tax rate might result in unjust discrimination if no change were made in the then existing rule governing the taxation of dividends. All profits earned by members of a partnership would be taxed at the rate prevailing in the year in which they were earned, although actually withdrawn in a later year when the tax rate was much higher. On the other hand, the tax upon the profits of a corporation earned in 1916 or earlier, would, if paid out in 1917 as dividends, be taxed at the high 1917 rates. There would be similar discrimination among the holders of stock in different corporations. The stockholders in those corporations which had deferred the distribution of profits

---

[3] The decision of this Court of *Lynch* v. *Hornby*, 247 U. S. 339, which sustained the Treasury's construction and held the act constitutional, was not rendered until June 3, 1918. See also *Peabody* v. *Eisner*, 247 U. S. 347.

earned prior to 1917, either generally from prudence or specifically with a view to stabilizing over a long period the rate of dividend, would be at a great disadvantage as compared with the stockholders in those corporations which had pursued the practice of distributing each year substantially all profits earned. On the other hand, if corporations were left free to determine out of what year's profits dividends paid in 1917 and subsequent years should be deemed to have been made, a corporation with a surplus derived from earnings made prior to 1917 could, while accumulating the profits of the war years, pay dividends on which its stockholders would escape the heavy war tax, by simply declaring that the dividends were payable out of the earnings of earlier years. And if there were still on hand such sufficient surplus earnings from the period prior to March 1, 1913, the dividends would be exempt from all tax. It was apparently to obviate such inequalities that Congress provided by § 31 (b) for an objective consideration of the date when the corporation earned the profits, as well as the date when the taxpayer received his share of them in the form of the dividend. By implying the condition stated above, the Douglas estate escapes from a position which would otherwise impute to Congress the intention of enabling the war profits of 1917 and subsequent years, actually distributed as dividends, to escape from the war taxes. But in implying the condition it imputes to Congress, which was seeking to prevent discrimination against stockholders in those corporations which had on January 1, 1917, surplus profits earned since March 1, 1913, the intention of grossly discriminating in their favor. For if this condition is read into the Act, stockholders in corporations which had no such surplus on December 31, 1917, are taxable on 1917 dividends at the high 1917 rates; while those in corporations which had such surplus are taxable on 1917 dividends at the lower rates of 1916 or earlier years.

Congress did not use the words " surplus account " or " undivided profits account." Its language is " undivided profits or surplus." The word " surplus " is a term commonly employed in corporate finance and accounting to designate an account on corporate books. But this is not true of the words " undivided profits." The surplus account represents the net assets of a corporation in excess of all liabilities including its capital stock. This surplus may be " paid-in surplus," as where the stock is issued at a price above par. It may be " earned surplus," as where it was derived wholly from undistributed profits. Or it may, among other things, represent the increase in valuation of land or other assets made upon a revaluation of the company's fixed property. See *La Belle Iron Works* v. *United States,* 256 U. S. 377, 385. As used in § 31 (b) the term undoubtedly means that part of the surplus which was derived from profits which, at the close of earlier annual accounting periods, were carried into the surplus account as undistributed profits. On the other hand, the term " undivided profits " has not acquired in corporate finance and accounting a like fixed meaning. It is not known as designating generally in business an account on the corporation's books, as distinguished from profits actually earned but not yet distributed.[4] Few business corporations establish an " undivided profits " account.[5] By most corporations the term " undivided profits " is employed to describe profits which have

---

[4] The Committee on Accounting Terminology of the American Association of Public Accountants was for years engaged in preparing a list of definitions. That contained in the Year Book of 1913, pp. 176–227, gives at p. 226 this definition: " Undivided Profits—Earnings or profits which have not been divided among the partners in a firm or the stockholders in a corporation."

[5] The Interstate Commerce Commission prescribes for the various classes of corporations subject to its supervision about 13 different forms of accounts, all of which include a general balance sheet. The number of items on the liability side of this balance sheet varies in

neither been distributed as dividends nor carried to surplus account upon the closing of the books; that is, current undistributed earnings.

That this is the natural meaning of the term "undivided profits" is indicated by the action of both Douglas and his estate.[6] That this is the meaning in which it was used by Congress is confirmed by the use of the expression "earnings and profits" later in the same paragraph,[7] and, also, by the use of the term "undivided profits" in § 207.[8] If it be accepted as the meaning in which Con-

---

these several forms from 8 to 33. There is no item "undivided profits" in any form.

By incorporated banks the term is commonly employed to designate the account in which profits are carried more or less temporarily, in contradistinction to the account called surplus in which are carried amounts treated as permanent capital, and which may have been derived from payments for stock in excess of par, or from profits which have been definitely devoted to use as capital. See *Fidelity Title & Trust Co.* v. *United States*, 259 U. S. 304, 308.

[6] Douglas received (see note 2, *supra*) from Phelps Dodge Corporation during 1917 six other dividends, aggregating $738,900, which were confessedly paid out of the 1917 profits—and which were reported by him as taxable in his return to the Commissioner of Internal Revenue. The two dividends here in question were reported by him in his return as not taxable solely on the ground that they were "depletion dividends." It was on this ground only that the estate, in its applications to the Treasury, sought recovery of the amount in suit.

[7] § 31 (b) " . . but nothing herein shall be construed as taxing any earnings or profits accrued prior to March first, nineteen hundred and thirteen, but such earnings or profits may be distributed in stock dividends or otherwise, exempt from the tax, after the distribution of earnings and profits accrued since March first, nineteen hundred and thirteen, has been made. This subdivision shall not apply to any distribution made prior to August sixth, nineteen hundred and seventeen, out of earnings or profits accrued prior to March first, nineteen hundred and thirteen."

[8] In § 207 of the same Act, which deals with the War Excess Profits Tax on corporations and makes the tax dependent on the amount of the invested capital, the term "undivided profits" is likewise used.

gress used the words, the course to be pursued under § 31 (b) becomes consistent with the general purpose evidenced by other parts of the Act. Its general aim was clearly to make the dividend, in whatever year paid, bear the tax rate of the year in which the profits of which it was a distribution had been earned; and for this purpose to treat as a unit the profits of the whole tax year. In providing measures for the attainment of that aim, it could be of no practical significance whether, at the time of the payment of the dividend, these profits appeared in a surplus or undivided profits account (as the profits earned within part of a year would, where a corporation closed its books monthly, quarterly, or semi-annually) or whether they still rested as current earnings without formal determination or specific allocation.

Besides this general aim, Congress had the special aim of making the war profits pay the high war taxes.[9] To this end it was essential that the law should, in determining the applicable tax rate, disregard any declaration of the corporation as to what year's profits were being distributed. Not only was it essential that every such declaration of the corporation should be disregarded, but also that the dividend should not thereupon be deemed to have been paid from the profits of the earliest year (since March 1, 1913) of which there remained accumulated

That section, in paragraph (a) 3 defines invested capital as including "paid in or earned surplus and undivided profits used or employed in the business, exclusive of undivided profits earned during the taxable year."

[9] To discourage the hoarding of profits in order to avoid the tax, two supplemental provisions were incorporated in the Act. By § 3, incorporating § 3 of the Revenue Act of 1916, Congress taxed as income received by the stockholder his proportion of profits earned by the corporation and fraudulently hoarded by it to avoid payment of the tax. By § 1206 (2), adding § 10 (b) to the Revenue Act of 1916, it subjected the corporation to an additional tax of 10 per cent. on undistributed income not employed in the business, unless invested in obligations of the United States.

profits available for distribution.   To accomplish the purpose of Congress it was necessary that the dividend be deemed to have been paid out of the available profits or earnings of the most recent year or years.   Its intention so to provide was adequately expressed by the use of the phrase "most recently accumulated" in connection with the words "undivided profits or surplus."   As, in the case at bar, there were profits of the year 1917 ample to cover all dividends, those here in suit must be deemed to have been paid therefrom.

*Reversed.*

MR. JUSTICE VAN DEVANTER, MR. JUSTICE McREYNOLDS, MR. JUSTICE SUTHERLAND, and MR. JUSTICE BUTLER, dissent.