### APPEAL OF AUTOMATIC FIRE PROTECTION CO.

Docket No. 3148.     Submitted July 7, 1925.     Decided April 19, 1926.

1. On June 30, 1913, taxpayer entered into a contract with the American District Telegraph Co. whereby the latter took over the business of installing and maintaining an automatic fire alarm and sprinkler supervisory service of the former and its subsidiaries and agreed to bear all expenses and assume all obligations in connection with said business for a period ending February 18, 1954, in consideration of the payment to the taxpayer by the American District Telegraph Co. of a specified percentage of the gross rentals. *Held*, that this was not a sale by the taxpayer of its business, and the alleged value of the contract may not be included as paid-in or earned surplus in computing invested capital of the taxpayer for 1917 and 1918.

2. The Board is unable from the evidence to determine the deduction to which the taxpayer was entitled in the years 1917 and 1918 for exhaustion of tangible and intangible property.

*Edward T. Magaffin, Esq.*, and *Jas. A. Councilor, C. P. A.*, for the taxpayer.

*Lee I. Park, Esq.*, for the Commissioner.

Before JAMES, LITTLETON, SMITH, and TRUSSELL.

This is an appeal from the determination of a deficiency in income and profits tax for 1918 in the amount of $23,062.30, against which is offset an overassessment of $5,432.16 for the year 1917.

#### FINDINGS OF FACT.

The taxpayer was incorporated May 5, 1903, under the laws of the State of Maine, its principal place of business being at Whitestone, Long Island, N. Y. It was organized for the purpose of furnishing an automatic fire alarm and sprinkler supervisory service, by means of which sprinkler systems were to be kept under constant supervision, thereby guaranteeing their perfect operation. These sprinkler systems consist of a series of water pipes and tanks so arranged and constructed that, in the event of fire breaking out in a building in which they are installed, the water begins to flow automatically.

The supervisory services operate by means of a series of electrical devices and contacts connecting the sprinkler system with a central office, causing an alarm to be transmitted to such office in the event of any of the following contingencies; that the water in the tanks is freezing, that the water level drops below a predetermined point, that any valve is accidentally or intentionally closed, that water starts to flow through the pipes, indicating a leak or fire, or that there is an interruption of the supervision, as where a wire or signaling device is broken or cut accidentally or intentionally Upon receipt of a signal, day or night, the central office immediately sends one of its employees to the premises. If the signal indicates a water-flow or any other complication signifying a fire, the fire department is called. The premises are thereafter kept under constant supervision until the fire is out or the defect in the system remedied and the ordinary supervisory service reestablished.

Prior to the incorporation of the taxpayer, Robert L. McElroy, in collaboration with one John E. Shepherd, developed a service of the nature herein described and applied for and obtained a number of patents covering the devices used. At the time the taxpayer was organized, some of the property owned by McElroy was exchanged for some of its stock.

On February 18, 1904, McElroy entered into a contract with the American District Telegraph Co., hereinafter referred to as the District Co., under which it was provided that, whereas McElroy and certain associates had applied for patents for certain electrical automatic, manual fire alarm and sprinkling valve signaling devices, McElroy should use such patents as should be issued in the manufacture of these devices and should deliver them to the District Co. for installation on the premises of subscribers to the service, these subscribers to be solicited by McElroy. It was further agreed that the District Co. should install the devices, make the necessary electrical connections with these devices, maintain a central office, and do all things necessary for the ordinary supervision and operation of the system. The District Co. was required to collect rentals and to turn over to McElroy 45 per cent of the gross amount. The contract, reciting one dollar and other valuable consideration, was to terminate on February 18, 1954.

On March 30, 1905, the agreement between McElroy and the District Co. was modified, and on April 21, 1905, the modified contract was assigned by McElroy to the taxpayer, which agreed to perform all acts previously required of McElroy. On the same date the District Co. signed an agreement acquiescing in the assignment.

On April 29, 1907, the taxpayer, the District Co., and the General Fire Extinguisher Co. entered into a contract whereby the latter

agreed to manufacture and install water flow shut-off and pressure signaling devices, and such other actuating devices and testing apparatus as should be necessary in the proper conduct of the business. Under this agreement the District Co. was required to pay to the General Fire Extinguisher Co. and to the taxpayer 25 per cent of the gross rentals received under contracts of subscribers to the service. It was also provided that this contract should expire on February 18, 1954.

The taxpayer acquired contracts with fire alarm and protection companies of many of the larger cities whereby the business of those companies passed to it. In other cases it acquired stock in such companies in order that their business might be brought within the provisions of the contract with the District Co. and the General Fire Extinguisher Co., and, in some instances, it organized subsidiary corporations for the purpose of extending its business. On April 29, 1909, the taxpayer entered into an agreement, designated therein as a 999-year lease, with the Fire Protection Development Co., a Maine corporation, hereinafter called the Development Co. By this agreement the entire business of the taxpayer was turned over to the Development Co., which agreed to fulfill the obligations of the taxpayer to enlarge and develop the business, and to pay to the taxpayer's stockholders annual dividends beginning at a certain rate and increasing to a specified maximum rate. This contract continued in force until June 13, 1913, when the following agreement was made:

AGREEMENT, made this 13th day of June, 1913, by and between AMERICAN DISTRICT TELEGRAPH COMPANY, a corporation duly organized and existing under the laws of the State of New Jersey (hereinafter called the "District Company"), AUTOMATIC FIRE PROTECTION COMPANY, a corporation duly organized and existing under the laws of the State of Maine (hereinafter called the "Automatic Company") and FIRE PROTECTION DEVELOPMENT COMPANY, a corporation duly organized and existing under the laws of the State of Maine (hereinafter called the "Development Company").

WITNESSETH:

WHEREAS, Robert L. McElroy and his assigns, the Automatic Fire Protection Company, have entered into contractual relations with the District Company as evidenced by a schedule of contracts made a part hereof, as follows:

March 2, 1903, between Ludlow Automatic Fire Alarm Co. and the American District Telegraph Co. of New Jersey.

Feb. 18, 1904, between Robert L. McElroy and American District Telegraph Company of New Jersey.

Mar. 30, 1905, between American District Telegraph Co. of New Jersey and Robert L. McElroy.

Apr. 21, 1905, between Automatic Fire Protection Co. of Maine and Robert L. McElroy.

Apr. 21, 1905, between American District Telegraph Co. of New Jersey and Automatic Fire Protection Co. of Maine.

July 27, 1905, between the same parties and others.

Oct. 12, 1905, between the same parties.

Apr. 29, 1907, between the same parties.

Apr. 29, 1907, between General Fire Extinguisher Co. of New York, Automatic Fire Protection Co. of Maine and American District Telegraph Co. of New Jersey;

under which Central Station Sprinkler Supervisory and Valve Alarm service and Automatic Fire Alarm service are being furnished by operations of the District Company through its various subsidiary companies, and

WHEREAS, the Development Company has succeeded to the rights and obligations of the said McElroy, and the said Automatic Company to the said contracts,

Now, THEREFORE, the parties hereto have agreed as follows:

### ARTICLE 1.

The District Company hereby assumes the entire burden and expense of soliciting business and agrees to furnish all instruments and materials, and agrees to install all mechanisms and devices which, under the above schedule of contracts, are the obligations of the Automatic Company and of the Development Company.

The District Company will secure all necessary permits, at its sole expense, for operating service as contemplated under the above schedule of contracts.

### ARTICLE 2.

The rentals hereunder collected for the first three (3) years' service under each installation hereafter made, except under contracts heretofore accepted, shall, (after deducting such sums, if any, as the General Fire Extinguisher Company shall be entitled to receive) be retained in toto by the District Company; thirty per cent (30%) of all gross rentals thereafter collected shall be retained by the District Company, and the remainder (after deducting such sums, if any, as the General Fire Extinguisher Company shall be entitled to receive) shall be divided equally between the District Company and the Automatic Company. Should the average rental for the first three years exceed the rental for any later year, the amount of such excess shall be deemed to be an installation fee, and all such fees, and all other installation fees shall be divided on the basis of,

50% (less the amount which the General Fire Extinguisher Company may be entitled to receive) to the Automatic Company; and

50% to the District Company.

### ARTICLE 3.

Thirty per cent (30%) of the gross rentals hereafter collected on all installations heretofore made, or contracted to be made, shall be retained in toto by the District Company, and the remainder (after deducting such sums, if any, as the General Fire Extinguisher Co. shall be entitled to receive) shall be divided equally between the District Company and the Automatic Company.

### ARTICLE 4.

All contracts hereafter made relating to installations then existing, whether with the original or other parties, shall be deemed to be renewals, and the division of rentals thereunder shall be made as stated in Article 3 hereof,

except that where increased revenues are received for the same or additional installations, the revenue to the extent of such increase shall be divided as stated in Article 2 hereof.

### ARTICLE 5.

The District Company will maintain an efficient organization devoted to the promotion of and will accept and promptly install the business of Automatic Fire Alarm Service and Sprinkler Supervisory and Valve Alarm service falling within the conditions named in the contracts above recited, in the expectation that the service will grow more rapidly under the greater organization management and undivided control of that company.

### ARTICLE 6.

The District Company will on the tenth (10th) day of each month submit to the Automatic Company a detailed statement of its gross receipts during the previous month pertaining to the business provided for in this contract, and with such statement remit the amount due thereunder. The District Company will promptly notify the Automatic Company of the commencement and of the termination of service to each subscriber. All contracts shall be executed in triplicate by the subscriber, and one copy thereof furnished to the Automatic Company.

### ARTICLE 7.

During the period of this contract the District Company or its subsidiaries receiving rentals from Manual Signal service in the City of New York shall account for the same up to but not exceeding the sum of $29,000 per annum under Article 3 hereof, deducting from such gross rentals also the sum of $5,000 per annum to be paid the Guardian Trust Company, Trustee.

### ARTICLE 8.

The Automatic Company owning or controlling the patents covering the various devices required for conducting the service contemplated under the above schedule of contracts, hereby grants to the District Company the exclusive license (except for devices to be used or sold outside of the United States) to manufacture, use or sell, or cause to be manufactured, used or sold any and all of the devices covered by such patents now owned or controlled or which may hereafter be owned or controlled by it, during the pendency of this contract, *Provided, however,* that all suits and all obligations arising out of the infringement of patents under contracts or installations existing at the date of this contract, whether such suits are now brought or hereafter to be brought, shall be taken care of and assumed by the Automatic Company; but all questions of infringement or obligations arising out of the use of patents under contracts or installations, or arising out of action taken after the date of this contract shall be borne by the District Company.

It is further agreed that during the pendency of this contract the provisions of Articles seven (7) and twenty-four (24) of the contract of February 18th, 1904, shall not be effective or be enforced by either party as against the other, but shall revive and become effective only in the event of the termination of this contract prior to February 18th, 1954.

### ARTICLE 9.

The Automatic Company shall assign, transfer and set over to the District Company all of its right, title and interest in and to all contracts for service

104881—27——84

with various customers and all property owned and used therewith, and the District Company shall from the date of this contract assume all duties and responsibilities under said contracts. All contracts with subscribers for service shall, from the date hereof, be taken in the name of the American District Telegraph Company (of New Jersey) or in the name of its subsidiary companies, and in case of breach of any of the obligations assumed by the District Company and its failure to remedy the same after thirty (30) days written notice thereof, all the interest in Central Station Automatic Fire Alarm and Sprinkler Supervisory and Valve Alarm service given to the Automatic Company under the contract of February 18th, 1904, and contracts supplementary thereto, shall, at the option of the Automatic Company, be assigned to it by the District Company and the rights of the parties with respect to the operation of such service shall be established on the basis named in said contract of February 18th, 1904, and any contract supplementary thereto. In such event, the District Company shall also assign to the Automatic Company all contracts with subscribers relative to such service whether taken in the name of the District Company or the Automatic Company or in the name of any of the subsidiaries of either of them.

ARTICLE 10.

It is mutually agreed that this contract shall be in force from the date first above written until February 18th, 1954, but all then existing contracts for service of the nature contemplated under the above schedule of contracts, and all the property installed inside the buildings hereunder, shall belong one-half to the District Company and one-half to the Automatic Company, and the District Company agrees that in the meantime no mortgage, lien or assignment will be placed on such property within buildings of subscribers without the consent of or without recognizing or reserving the rights of the Automatic Company.

ARTICLE 11.

Sales of equipment or devices for any of the service herein referred to may be made, but for such sales or any private installations made the District Company shall pay to the Automatic Company five per cent (5%) of the gross contract price for all such sales or installations outside of cities where Central service is now or hereafter may be maintained, and ten per cent (10%) in such cities where such Central service is maintained, except in cases where competition exists, and in such cases five per cent (5%), Provided, that in case any such equipment or devices so sold, or installation is thereafter connected with the Central station service or any service rendered in relation thereto, the said Central service connection or such service shall be charged for at the then existing standard rates, and the revenue therefrom shall be divided under the provisions of Article 3 of this contract. Standard rates for maintenance and inspection or either shall not be less than one-half the then existing standard rates for Central station service.

ARTICLE 12.

All fixed charges and obligations of the Fire Protection Development Company under its contract with James G. Nolen, dated January 3d, 1911, shall be borne in the following manner:—The amount due Nolen shall be deducted from the gross revenue arising from the business under the above schedule of contracts, and the Fire Protection Development Company is relieved, as of the date of this contract, from any further obligation in relation thereto.

All fixed charges and obligations of the Automatic Company under the leases of the National Automatic Fire Alarm Company of Ohio (Cleveland plant), the National Automatic Fire Alarm Company of Cincinnati, Ohio, and of the National Automatic Fire Alarm Company of Louisville, and of the Special Fire Alarm Electrical Signal Company shall be borne by the District Company unless otherwise herein provided, and the Automatic Company, as of the date of this contract, is relieved from any further obligation in relation thereto.

### ARTICLE 13.

The District Company hereby agrees that it will sell to the Automatic Company equipment for operating systems contemplated under the above schedule of contracts for export by the Automatic Company, the amount to be charged by the District Company to the Automatic Company to be equal to the District Company's total cost plus ten per cent (10%).

### ARTICLE 14.

The District Company will assume and pay for, as of the date of this contract, the unfilled portion of all Automatic Company's outstanding orders for material and devices of such nature as may be required by the District Company for furnishing service of the nature provided under the above schedule of contracts. The District Company will also pay to the Automatic Company on the execution of this agreement the manufacturer's cost to it of all material and devices on hand that may be used by the District Company, and a schedule, as of the date of this contract, of the unfilled orders of the Automatic Company for such material and for such devices is hereto attached as part of this contract.

### ARTICLE 15.

The District Company hereby agrees that if the American Telephone & Telegraph Company or the Western Union Telegraph Company, or the subsidiaries of either of them, engage in Sprinkler Supervisory or Valve Alarm service or Automatic Fire Alarm service of the nature contemplated under the above schedule of contracts, it will (so long as present relations or their substantial equivalent exist between the District Company and such Telephone and Telegraph Companies or either of them) pay to the Automatic Company on the gross revenue from such service performed by any such company the amounts as provided in Article 2.

### ARTICLE 16.

The District Company may buy business of the nature contemplated by said schedule of contracts, and the same, whether heretofore or hereafter purchased, shall be deemed to be business of the nature of that described in Article 2 and gross returns therefrom divided accordingly unless otherwise provided.

### ARTICLE 17.

The Automatic Company hereby agrees to turn over to the District Company all its subsidiary companies doing business in the United States, and all franchises owned or controlled by it or by Robert L. McElroy.

The District Company hereby agrees to accept such sudsidiary companies for its use and purpose as it may see fit, and to assume their current taxes and their obligations hereafter incurred.

The stock of such subsidiary companies has been pledged by the Automatic Company as security for the payment of an issue of four hundred thousand dollars ($400,000) of bonds, which the Automatic Company covenants and agrees to pay, and to save the District Company harmless therefrom.

ARTICLE 18.

The District Company hereby agrees to avail itself of the three (3) year option allowed it under Article 4, contract of February 18th, 1904, and Article 5, contract of April 29th, 1907, covering contracts made with subscribers in which certain excess expenditures were made by the Automatic Company, it being understood and agreed that the distribution of the revenue derived from such contracts with subscribers shall be in accordance with the terms of Article 3 of this contract.

ARTICLE 19.

The Fire Protection Development Company of Maine hereby assents to all the provisions and conditions of the foregoing agreement, and agrees to assist the Automatic Company in carrying out the same in all particulars, and said Fire Protection Development Company hereby relinquishes all its rights under its contract with the Automatic Fire Protection Company, dated April 29th, 1909, and is hereby absolved from all obligations thereunder.

In consideration of the release by the Development Co. of the taxpayer from the contract of April 29, 1909, the taxpayer agreed to pay to the Development Co. a certain percentage of its annual net income.

At the time the agreement quoted above was entered into, the taxpayer had outstanding stock of a par value of $3,600,000 and bonds in the amount of $400,000.

On several different occasions before the making of the contract of June 13, 1913, the District Co. sought to purchase the business of the taxpayer. Its first effort was made about 1907, at which time the taxpayer placed a price of $1,000,000 on the business. Some time later the District Co. sought to close the deal on that basis. The offer, however, was withdrawn and a counteroffer was made to sell at $1,500,000. Later the taxpayer increased this amount to $1,750,000.

The gross rentals received from all of the service contracts for the years 1903 to 1924, inclusive, were as follows:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1903 | $11,518.50 | 1914 | $573,036.25 |
| 1904 | 25,148.00 | 1915 | 623,615.62 |
| 1905 | 117,437.26 | 1916 | 682,679.49 |
| 1906 | 160,635.13 | 1917 | 742,894.64 |
| 1907 | 254,955.88 | 1918 | 815,981.30 |
| 1908 | 297,688.53 | 1919 | 896,394.35 |
| 1909 | 336,566.28 | 1920 | 1,036,840.07 |
| 1910 | 390,543.10 | 1921 | 1,150,064.22 |
| 1911 | 436,677.64 | 1922 | 1,227,796.14 |
| 1912 | 487,056.25 | 1923 | 1,311,353.44 |
| 1913 | 526,000.15 | 1924 | 1,391,252.25 |

Since June, 1913, the business of the taxpayer has consisted of the receipt and disposition of its share of the gross rentals listed above. It has also received small miscellaneous items of income for the years 1914 to 1922, inclusive, as follows:

| | | | |
|---|---|---|---|
| 1914 | $2,370.39 | 1919 | $462,82 |
| 1915 | 288.57 | 1920 | 1,301.75 |
| 1916 | 552,56 | 1921 | 2,324.14 |
| 1917 | 202.88 | 1922 | 3,803.75 |
| 1918 | 268.59 | | |

The expenses of the taxpayer for the years 1914 to 1922, inclusive, were as follows:

| | 1914 | 1915 | 1916 | 1917 | 1918 |
|---|---|---|---|---|---|
| Salaries | $4,272.50 | $4,706.00 | $5,664.00 | $5,036.00 | $5,633.00 |
| Office and shop rentals | 900.00 | 990.00 | 1,116.00 | 900.00 | 900.00 |
| Miscellaneous office expense | 116.84 | 562.48 | 157.70 | 204.27 | 587.87 |
| Taxes, other than Federal taxes | 225.00 | 225.00 | 225.00 | 555.75 | 718.50 |
| Litigation expense on matters pending June 13, 1913, and patent fees | 4,412.27 | 8,562.08 | 4,677.96 | 1,071.62 | 924.78 |
| Bond interest | 19,600.00 | 19,600.00 | 19,550.00 | 19,550.00 | 19,866.98 |
| Plant rentals: | | | | | |
|   Fire Protection Development Co | 46,000.00 | 18,000.00 | 48,000.00 | 31,125.00 | 34,875.00 |
|   Special fire plant | 2,499.96 | 2,499.96 | 2,499.96 | 2,499.96 | 2,499.96 |
|   Miscellaneous | 900.05 | 297.71 | 235.90 | 409.61 | 286.05 |

| | 1919 | 1920 | 1921 | 1922 |
|---|---|---|---|---|
| Salaries | $4,897.50 | $5,980.00 | $6,390.00 | $7,069.65 |
| Office and shop rentals | 900.00 | 1,500.00 | 1,500.00 | 1,500.00 |
| Miscellaneous office expense | 429.84 | 406.32 | 707.42 | 385.17 |
| Taxes, other than Federal taxes | 1,948.50 | 1,365.00 | 826.00 | 918.00 |
| Litigation expense on matters pending June 13, 1913, and patent fees | | | 20.00 | |
| Bond interest | 19,550.00 | 19,550.00 | 20,286.90 | 19,561.11 |
| Plant rentals: | | | | |
|   Fire Protection Development Co | 48,000.00 | 48,000.00 | 48,000.00 | 48,000.00 |
|   Special fire plant | 2,499.96 | 2,499.96 | 2,499.96 | 2,499.96 |
|   Miscellaneous | | | | 428.93 |

The Commissioner computed the profits tax for the years 1917 and 1918 in accordance with the provisions of sections 210 and 328 of the Revenue Acts of 1917 and 1918, respectively.

OPINION.

LITTLETON: The taxpayer assigns two errors. First, that the computation of the profits tax should have been based on the actual invested capital for those years as represented by the contract with the District Co., which it is alleged had a value of $2,000,000 on the date it was made. Second, that it should be allowed to deduct on account of exhaustion the pro rata part of the alleged value of the contract for each year the contract was to run.

Briefly stated, the term "invested capital" as defined by section 207 of the Revenue Act of 1917 and section 326 of the Revenue Act of 1918, means (1) cash paid in for stock, (2) actual cash value of

tangible property paid in for stock, (3) with some limitations, actual cash value of intangible property paid in for stock, (4) paid-in surplus, and (5) earned surplus and undivided profits, not including profits earned during the taxable year; and no amount may properly be included in invested capital for the purpose of computing the profits tax unless that amount comes within the definition of the term as expressed by Congress.

In determining this appeal we may reasonably assume that nothing of value was paid in for stock or as surplus. If cash or property of value had been paid in, it would only have been necessary for the taxpayer to have established that value as of the date of payment, in order to justify its inclusion in invested capital. No effort, however, was made to establish such value. The only information to be obtained from the record in reference to the issue of stock is that emanating from the general statement of one of the witnesses, namely, that on organization, stock was issued for patents and related property, and also from the fact that on June 13, 1913, the par value of the stock outstanding was $3,600,000. If, therefore, there is any merit in the contention of the taxpayer that its invested capital is determinable, the basis for the claim must be that the amount contended for represents earned surplus and undivided profits.

Counsel for the taxpayer have rested their claim for invested capital on the single proposition that on June 13, 1913, the taxpayer had a profitable business, which, on that date, was exchanged for a contract worth $2,000,000. We are convinced that the business in which the taxpayer was interested was profitable, and it no doubt had property of value, but that alone is not sufficient to establish the right to include such value in invested capital, for it may represent appreciation of assets. See *La Belle Iron Works* v. *United States*, 256 U. S. 377. Our conclusions, therefore, must be based entirely upon the effect of the agreement with the District Co. If the value of that contract can properly be included in invested capital as earned surplus and undivided profits, it must, in fact, be earned surplus and undivided profits. There is nothing indeterminate or vague in the meaning of these terms. The Supreme Court, in *Edwards* v. *Douglas*, 269 U. S. 204, 214, stated that surplus " may be ' earned surplus,' as where it was derived wholly from undistributed profits," and that " by most corporations the term ' undivided profits ' is employed to describe profits which have neither been distributed as dividends nor carried to surplus account upon the closing of the books." In other words, earned surplus and undivided profits consist of profits realized and accumulated in the business, and, if such profits are determinable, they should be included in invested capital.

Under these circumstances, it becomes necessary to examine the contract to see whether or not there was a completed transaction from which profits were realized, and, if so, whether those profits were determinable. The District Co. agreed to take over and operate the business, to bear all expenses, to assume all obligations of the taxpayer in connection therewith and to pay to the taxpayer a specified percentage of the gross rentals. By article 8 the taxpayer granted to the District Co., " the exclusive license (except for devices to be used or sold outside of the United States), to manufacture, use or sell, or cause to be manufactured, used or sold any and all of the devices " covered by patents owned or controlled by the taxpayer. Under article 9, the taxpayer assigned, transferred and set over " all of its right, title and interest in and to all contracts for service with various customers and all property owned and used therewith." This article also provided that in case of breach of any of the obligations assumed by the District Co. and failure to remedy the same after 30 days' written notice, all contracts for service should be assigned to the taxpayer. Article 11 required the District Co. to pay to the taxpayer a certain percentage on the sale of equipment and devices. By article 17 all of the taxpayer's subsidiary corporations and all franchises belonging to the taxpayer or its subsidiaries were " turned over " to the District Co. Article 10 provided that upon the expiration of the period of the contract the then existing service contracts and all equipment installed thereunder should be divided equally between the taxpayer and the District Co., and, further, that during the period of the contract no mortgage, lien, or assignment should be placed on such property " without the consent of or without recognizing or reserving the rights of the Automatic Company."

Although some of these provisions would indicate that the reasoning advanced by counsel that the taxpayer parted absolutely with the business is sound, there are other provisions which support the opposite view. Certainly no such interpretation could be placed on the contract when all provisions are considered as a unit. The taxpayer clearly has not parted absolutely with its business or with all its rights in the business assets, even though there was an assignment of all right, title, and interest in the contracts with customers and the devices used in connection with these contracts, for provision was made that all such property, at the expiration of the contract, should be divided equally between the parties. Furthermore, the provision that the property should not be encumbered during the period of the contract without first obtaining the taxpayer's consent or reserving the taxpayer's rights therein, indicates that there was no intention to make an absolute transfer. If such had been the inten-

tion, it is reasonable to presume that the patents would have been transferred outright instead of by way of exclusive license with the reservation for use in connection with the business in foreign countries.

Taking the provisions of the contract as a whole, the effect of the instrument appears to be similar to that of a lease of a going business with an absolute assignment of certain assets which, if not assigned, might tend to prevent the lessee from operating the business to the best advantage of the parties interested. The agreement did not constitute a completed transaction from which profits were realized, but was merely an arrangement for a change in the management and operation of the business from which the taxpayer hoped to derive increased profits.

It is apparent, therefore, that the execution of the agreement of June 13, 1913, did not result in the realization of determinable profits, which could, in the form of earned surplus and undivided profits, be carried into invested capital for the purpose of computing the profits tax.

At this point it may be well to take notice of the contract of April 29, 1909, between the taxpayer and the Development Co. This contract was termed " a 999-year lease," but beyond that it was, as far the principal provisions were concerned, not essentially different from the contract with the District Co. By it the Development Co. took over completely assets of the same nature as those transferred to the District Co. by the contract of June 13, 1913, and assumed duties which were in effect the same as those assumed by the District Co. under the subsequent contract.

We are not able, on the evidence before us, to determine the taxpayer's invested capital for the years 1917 and 1918, nor can we say that the taxpayer had any invested capital for those years, within the meaning of section 207 of the Revenue Act of 1917 and section 326 of the Revenue Act of 1918. Under these circumstances, we are not disposed to disturb the computation of excess and war-profits tax for the years in question made by the Commissioner in accordance with the provisions of section 210 of the Revenue Act of 1917 and section 328 of the Revenue Act of 1918.

In view of our findings with reference to the contract of June 13, 1913, and the value thereof, the determination of the second contention of the taxpayer becomes comparatively simple. That a corporation is entitled to deductions for the exhaustion of a contract over the life of such contract, where the cost of the contract was properly capital of the corporation, is not questioned. See *Appeal*

*of Atlantic Carton Corporation,* 2 B. T. A. 380. In order, however, to obtain the benefit of such an allowance in this appeal, it is first necessary to determine the cost of the contract to the taxpayer. It is contended on its behalf that a business worth $2,000,000 was exchanged for the contract in question, but this, we have seen, does not represent the true facts. Some assets of an undetermined value were transferred and the control and operation of the business was placed in the hands of the District Co. for a period ending February 18, 1954, on which date, in accordance with the provisions of the contract, the taxpayer is to receive half of the contracts with customers and half of the property used in the performance of those contracts. Even though we should concede that the business of the taxpayer on the date the contract in question was made was worth $2,000,000, and that it was transferred for the contract, as represented by the taxpayer, it would be necessary, before we could determine the proper rate of depreciation, to place a value upon the contracts and property to be received by the taxpayer at the expiration of the contract. It is argued that it would be impossible for the taxpayer to perform the contracts returned; that the equipment received will be so much junk in the hands of the taxpayer. In our opinion, from the facts presented, there is considerable ground for believing that they will be of decided value. The taxpayer has, in our opinion, failed to show the cost of the contract in question, and it is therefore impossible to compute the proper allowance for the exhaustion thereof.

The additional argument has been presented that, in the event it be found that the contract of June 13, 1913, was not an absolute transfer of the taxpayer's business, the taxpayer should be allowed a deduction representing the exhaustion of its property, both tangible and intangible. On this point we can only say that the taxpayer is undoubtedly entitled to a reasonable allowance for the exhaustion of wasting assets owned by it, but, because of lack of evidence, we are unable to determine what the proper allowance is. We have no information with reference to the cost of any of the assets of the taxpayer, nor can we, from the facts before us, determine their value as of March 1, 1913; nor have we any definite information as to the quantity of tangible and intangible property which is subject to exhaustion, the nature of such property, or the probable life thereof.

*Order of redetermination will be entered on 15 days' notice, under Rule 50.*