*1275 OPINION.
Littleton :
The taxpayer assigns two errors. First, that the computation of the profits tax should have been based on the actual invested capital for those years as represented by the contract with the District Co., which it is alleged had a value of $2,000,000 on the date it was made. Second, that it should be allowed to deduct on account of exhaustion the pro rata part of the alleged value of the contract for each year the contract was to run.
Briefly stated, the term “ invested capital ” as defined by section 207 of the Revenue Act of 1917 and section 326 of the Revenue Act of 1918, means (1) cash paid in for stock, (2) actual cash value of *1276 tangible property paid in for stock, (3) with some limitations, actual cash value of intangible property paid in for stock, (4) paid-in surplus, and (5) earned surplus and undivided profits, not including profits earned during the taxable year; and no amount may properly be included in invested capital for the purpose of computing the profits tax unless that amount comes within the definition of the term as expressed by Congres's.
In determining this appeal we may reasonably assume that nothing of value was paid in for stock or as surplus. If cash or property of value had been paid in, it would only have been necessary for the taxpayer to have established that value as of the date of payment, in order to justify its inclusion in invested capital. No effort, however, was made to establish such value. The only information to be obtained from the record in reference to the issue of stock is that emanating from the general statement of one of the witnesses, namely, that on organization, stock was issued for patents and related property, and also from the fact that on June 13, 1913, the par value of the stock outstanding was $3,600,000. If, therefore, there is any merit in the contention of the taxpayer that its invested capital is determinable, the basis for the claim must be that the amount contended for represents earned surplus and undivided profits.
Counsel for the taxpayer have rested their claim for invested capital on the single proposition that on June 13,1913, the taxpayer had a profitable business, which, on that date, was exchanged for a contract worth $2,000,000. We are convinced that the business in which the taxpayer was interested was profitable, and it no doubt had property of value, but that alone is not sufficient to establish the right to include such value in invested capital, for it may represent appreciation of assets. See La Belle Iron Works v. United States, 256 U. S. 377. Our conclusions, therefore, must be based entirely upon the effect of the agreement with the District Co. If the value of that contract can properly be included in invested capital as earned surplus and undivided profits, it must, in fact, be earned surplus and undivided profits. There is nothing indeterminate or vague in the meaning of these terms. The Supreme Court, in Edwards v. Douglas, 269 U. S. 204, 214, stated that surplus “ may be ‘earned surplus,’ as where it was derived wholly from undistributed profits,” and that “ by most corporations the term ‘ undivided profits ’ is employed to describe profits which have neither been. distributed as dividends nor carried to surplus account upon the closing of the books.” In other words, earned surplus and undivided profits consist of profits realized and accumulated in the business, and, if such profits are determinable, they should be included in invested capital.
*1277 Under these circumstances, it becomes! necessary to examine the contract to see whether or not there was a completed transaction from which profits were realized, and, if so, whether those profits were determinable. The District Co. agreed to take over and operate the business, to bear all expenses, to assume all obligations of the taxpayer in connection therewith and to pay to the taxpayer a specified percentage of the gross rentals. By article 8 the taxpayer granted to the District Co., “ the exclusive license (except for devices to be used or sold outside of the United States), to manufacture, use or sell, or cause to be manufactured, used or sold any and all of the devices ” covered by patents owned or controlled by the taxpayer. Under article 9, the taxpayer assigned, transferred and set over “ all of its right, title and interest in and to all contracts for service with various customers and all property owned and used therewith.” This article also provided that in case of breach of any of the obligations assumed by the District Co. and failure to remedy the same after 30 days’ written notice, all contracts for service should be assigned to the taxpayer. Article 11 required the District Co. to pay to the taxpayer a certain percentage on the sale of equipment and devices. By article 17 all of the taxpayer’s subsidiary corporations and all franchises belonging to the taxpayer or its subsidiaries were “ turned over ” to the District Co. Article 10 provided that upon the expiration of the period of the contract the then existing service contracts and all equipment installed thereunder should be divided equally between the taxpayer and the District Co., and, further, that during the period of the contract no mortgage, lien, or assignment should be placed on such property “ without the consent of or without recognizing or reserving the rights of the Automatic Company.”
Although some of these provisions would indicate that the reasoning advanced by counsel that the taxpayer parted absolutely with the business is sound, there are other provisions which support the opposite view. Certainly no such interpretation could be placed on the contract when all provisions are considered as a unit. The taxpayer clearly has not parted absolutely with its business or with all its rights in the business assets, even though there was an assignment of all right, title, and interest in the contracts with customers and the devices used in connection with these contracts, for provision was made that all such property, at the expiration of the contract, should be divided equally between the parties. Furthermore, the provision that the property should not be encumbered during the period of the contract without first obtaining the taxpayer’s consent or reserving the taxpayer’s rights therein, indicates that there was no intention to make an absolute transfer. If such had been the inten *1278 tion, it is reasonable to presume that the patents would have been transferred outright instead of by way of exclusive license with the reservation for use in connection with the business in foreign countries.
Taking the provisions of the contract as a whole, the effect of the instrument appears to be similar to that of a lease of a going business with an absolute assignment of certain assets which, -if not assigned, might tend to prevent the lessee from operating the business to the best advantage of the parties interested. The agreement did not constitute a completed transaction from which profits were realized, but was merely an arrangement for a change in the management and operation of the business from which the taxpayer hoped to derive increased profits.
It is apparent, therefore, that the execution of the agreement of June 13, 1913, did not result in the realization of determinable profits, which could, in the form of earned surplus and undivided profits, be carried into invested capital for the purpose of computing the profits tax.
At this point it may be well to take notice of the contract of April 29, 1909, between the taxpayer and the Development Co. This contract was termed “ a 999-year lease,” but beyond that it was, as far the principal provisions were concerned, not essentially different from the contract with the District Co. By it the Development Co. took over completely assets of the same nature as those transferred to the District Co. by the contract of June 13, 1913, and assumed duties which were in effect the same as those assumed by the District Co. under the subsequent contract.
We are not able, on the evidence before us, to determine the taxpayer’s invested capital for the years 1917 and 1918,' nor can we say that the taxpayer had any invested capital for those years, within the meaning of section 207 of the Revenue Act of 1917 and section 326 of the Revenue Act of 1918. Under these circumstances, we are not disposed to disturb the computation of excess and war-profits tax.for the years in question made by the Commissioner in accordance with the provisions of section 210 of the Revenue Act of 1917 and section 328 of the Revenue Act of 1918.
In view of our findings with reference to the contract of June 13, 1913, and the value thereof, the determination of the second contention of the taxpayer becomes comparatively simple. That a corporation is entitled to deductions for the exhaustion of a contract over the life of such contract, where the cost of the contract was properly capital of the corporation, is not questioned. See Appeal *1279 of Atlantic Carton Corporation, 2 B. T. A. 380. In order, however, to obtain the benefit of such an allowance in this appeal, it is first necessary to determine the cost of the contract to the taxpayer. It is contended on its behalf that a business worth $2,000,000 was exchanged for the contract in question, but this, we have seen, does not represent the true facts. Some assets of an undetermined value were transferred and the control and operation of the business was placed in the hands of the District Co. for a period ending February 18, 1954, on which date, in accordance with the provisions of the contract, the taxpayer is to receive half of the contracts with customers and half of the property used in the performance of those contracts. Even though we should concede that the business of the taxpayer on the date the contract in question was made was worth $2,000,000, and that it was transferred for the contract, as represented by the taxpayer, it would be necessary, before we could determine the proper rate of depreciation, to place a value upon the contracts and property to be received by the taxpayer at the expiration of the contract. It is argued that it would be impossible for the taxpayer to perform the contracts returned; that the equipment received will be so much junk in the hands of the taxpayer. In our opinion, from the facts presented, there is considerable ground for believing that they will be of decided value. The taxpayer has, in our opinion, failed to show the cost of the contract in question, and it is therefore impossible to compute the proper allowance for the exhaustion thereof.
The additional argument has been presented that, in the event it be found that the contract of June 13, 1913, was not an absolute transfer of the taxpayer’s business, the taxpayer should be allowed a deduction representing the exhaustion of its property, both tangible and intangible. On this point we can only say that the taxpayer is undoubtedly entitled to a reasonable allowance for the exhaustion of wasting assets owned by it, but, because of lack of evidence, we are unable to determine what the proper allowance is. We have no information with reference to the cost of any of the assets of the taxpayer, nor can we, from the facts before us, determine their value as of March 1, 1913; nor have we any definite information as to the quantity of tangible and intangible property which is subject to exhaustion, the nature of such property, or the probable life thereof.
Order of redeterrmnation will he entered on 15 days’ notice, under Rule 50.