Mountain State Steel Foundries, Inc. v. Commissioner.
Mountain State Steel Foundries, Inc. v. Commissioner
Docket No. 69987.
United States Tax Court
T.C. Memo 1959-59; 1959 Tax Ct. Memo LEXIS 181; 18 T.C.M. (CCH) 306; T.C.M. (RIA) 59059; March 31, 1959
Robert P. Smith, Esq., 815 Fifteenth Street, Northwest, Washington, D.C., and Dorothea Baker, Esq., for the petitioner. W. Ralph Musgrove, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion The respondent determined deficiencies in income tax of petitioner for the taxable years ended June 30, 1951, 1952, 1953, and *182 1954, in the amounts of $20,660.32, $43,065.13, $42,692.80, and $14,676.73, respectively. The issues are: (1) Whether the amounts paid by petitioner on the Miller obligations in each of the respective taxable years constitute deductible interest payments; (2) Whether petitioner is liable for the surtax imposed by section 102 of the 1939 Code; (3) Whether the cost of certain replacements and additions to machinery and buildings in each of the taxable years are deductible as ordinary expenses, or are capital expenditures subject to depreciation, and; (4) Whether the amounts of $7,879.08, $7,308.68, and $5,766.08, constitute excessive additions to the reserve for bad debts for the taxable years ended June 30, 1952, 1953, and 1954, respectively. Certain auxiliary questions are (a) whether the net income, subject to excess profits tax for the years ended June 30, 1951, 1952, and 1953, should be increased by reason of the above adjustments in the issues 1 to 4, inclusive, and (b) the correct net operating loss sustained in the year ended June 30, 1955, for carry-back purposes to the taxable year ended June 30, 1954. Findings of Fact Petitioner is a West Virginia corporation with *183 its principal place of business at Parkersburg, West Virginia. Its principal business is the manufacture of steel castings. Its income tax returns for the taxable periods involved were filed with the district director of internal revenue at Parkersburg, West Virginia. Petitioner is the successor of a partnership composed of the Stratton and Miller families, each having a 50 per cent interest. The Stratton family consisted of Harold F. Stratton, his sister, Marguerite Stratton Nobles, and two nephews. The Miller family consisted of Ben Miller, his wife, Edna, and two daughters, Jacqueline M. Cauthorn, and Jane S. Miller. Ben Miller died in 1945, and his wife and two daughters succeeded to his interest in the partnership. On July 1, 1947, the business was incorporated under the name of the Mountain State Steel Foundries, Inc. In exchange for the partnership assets and the assumption of its liabilities, 2,000 shares of the par value of $100 per share were issued as follows: Shares
Harold F. Stratton
President
250
Marguerite S. Nobles
Secretary-Treas-
urer
250
Mark E. Stratton
Vice President
250
Robert S. Nobles
2nd Vice Presi-
dent
250
Edna W. Miller
500
Jacqueline M. Cauthorn
250
Jane S. Miller
250
*184 The board of directors consisted of Harold F. Stratton, Marguerite S. Nobles, and Edna W. Miller, until the latter resigned on the sale of her stock. Other than serving as director, Edna took no active part of the business. Edna and her two daughters felt they should have more security than dividends from an operating foundry. Edna held some conferences with Harold Stratton about selling either the plant or the stock. In 1948, Harold gave an option to a broker to purchase the stock at $850 per share. The option was not exercised. Harold let it be known that the plant or the stock was for sale at a price of $750 a share. Some interested parties examined the plant but made no counteroffers. At a stockholders' meeting held on the 8th day of August 1950, Edna stated that she had been discussing with George M. Nicholson, the possibility of the purchase by the corporation of the stock held by her and her daughters, the basis of a reasonable cash payment, and the payment of the remainder with interest over a period of years, and he had advised that he had also discussed the matter with representatives of the company. It was moved and seconded that Nicholson be authorized and instructed *185 to pursue the negotiations and report the results at the adjourned meeting of the stockholders to be held on September 11, 1950. Nicholson was a certified public accountant and had made out the corporation and the individual tax returns of some of the stockholders. At the adjourned stockholders' meeting held on September 11, 1950, the president stated an agreement had been reached with the Miller interests for the purchase of their stock by the company. On motion of Edna, the directors and officers were authorized to purchase the 1,000 shares of capital stock owned by the Miller interests on the basis of the payment of $450,000 on the following terms: Edna W. Miller, 500 shares, $30,000 cash and a note for $195,000, payable with interest at 4 per cent at the rate of $6,000 each six months beginning April 1, 1951, and continuing until the principal and interest are paid as set forth in a schedule of payments attached thereto. V. J. Miller Cauthorn, 250 shares, $10,000 cash and a note for $102,500 payable with interest at 4 per cent at the rate of $2,500 each six months beginning April 1, 1951, and continuing until the principal and interest are paid as set forth by schedule of *186 payments attached thereto. A similar provision was made with respect to the 250 shares owned by Jane S. Miller. The corporation's note for the respective amounts above set forth was executed and delivered to each seller. The notes were secured by certificates of stock of the petitioner in the same number of shares that each owner had surrendered. The notes contained a provision that during their existence the petitioner would limit its dividend payments, and also an acceleration clause effective at any time after April 1, 1961. A schedule of payments of principal and interest was attached to each note. The payments of principal and interest was to continue in the case of Edna until April 1, 1977, and the payments on the other two notes were to continue until April 1, 1994. The total contingent interest liability on the three notes is in the amount of $351,069.56. The 1,000 shares of petitioner's capital stock redeemed in September 1950, was carried on the asset side of the corporation's balance sheet as Treasury stock at $450,000. Petitioner's surplus, per books, on July 1, 1950, was $132,527.53. In its returns for the taxable years ended June 30, 1951 to 1954, inclusive, *187 petitioner claimed a deduction as representing interest payments on the three promissory notes given in connection with the aforesaid redemption of the amounts of $11,969.99, $15,757.00, $15,504.77, and $15,242.37, respectively. The respondent disallowed the entire amount claimed for each year as not constituting a proper deduction. Petitioner has failed to show that the aforesaid amounts claimed as deductions constitute "interest" within the purview of section 23(b) of the Internal Revenue Code of 1939. In the deficiency notice the respondent disallowed deductions for business expenses of the amount of $754.24, and the amount of $2,847, claimed in the respective taxable years ended June 30, 1951 and 1952. By virtue of the respective concessions of the parties, the appropriate adjustments may be made under Rule 50. For the taxable year ended June 30, 1953, the respondent disallowed the amount of $11,917.73 claimed as ordinary and necessary expenses for repairs. The items involved are as follows: Repairs to officers' property
$ 266.25
Heater
171.63
Grinder motor
260.60
Hand tool
131.50
Hand tool
226.38
Temporary partition
289.60
Shore roof and construction of
wall
984.92
Repair to metal storage building
817.84
Repair to metal storage building
1,681.35
Repair roof on foundry
2,025.00
Replace part of foundry roof ad-
dition to and replacement of
office building
2,910.82
Replacing office building floor
647.40
Stairway to overhead cranes
314.44
Total
$11,917.73
*188 Petitioner concedes the item of $266.25 representing repairs to officers' property. Respondent concedes error as to the following items: Heater
$171.63
Grinder motor
260.60
Hand tool
131.50
Hand tool
226.38
Total
$790.11 The amount of $314.44, representing stairway to overhead cranes was a repair constituting an ordinary and necessary expense. The remaining items, totalling $10,546.93, are capital improvements subject to depreciation. In the deficiency notice the respondent disallowed as business expenses in the taxable year ended June 30, 1954, the amount of $5,154.60, consisting of the following items: Materials and supplies
$ 203.85
Miscellaneous and general ex-
pense
2,293.45 *
Repairs
2,657.30
Total
$5,154.60
Respondent concedes error as to the item of $203.85, representing the cost of a resistor bank motor. In the taxable year ended June 30, 1954, the petitioner expended the sum of $2,283.45 * to replace electrical wiring in and around the foundry, and the amount of $2,657.30 to repair the moulding machine which had originally *189 cost $4,000 to $5,000. The expenditures agrgregating $4,940.75 are capital improvements. In the deficiency notice, the respondent disallowed as additions to petitioner's bad debt reserve, the following amounts: F/y June 30, 1952
$7,879.08
F/y June 30, 1953
7,308.68
F/y June 30, 1954
5,766.08
On July 1, 1947, petitioner took over the partnership bad debt reserve in the amount of $9,477.69. Petitioner added credits to its reserve for bad debts account, representing the collection of debts previously charged off, and charged off bad debts for the years ending June 30, 1948, 1949, and 1950, the amounts as follows: F/y ended
Credits to
June 30
Reserve
Charge-offs
1948
$475.95
$170.55
1949
724.61
1950
161.23
357.91
Petitioner's accounts receivable at close of year, additions to reserve (per return), charge-offs, and balance of bad debt reserve were in the respective amounts as follows: Year ending
Accounts receivable
Additions per
Charge-
6/30
close of year
returns
offs
Balance
1951
$120,856.91
0
$1,147.99
$ 7,492.61
1952
109,369.89
$7,879.08
1,314.60
14,136.94
1953
118,015.17
7,308.68
0
22,760.22
1954
92,169.36
5,766.08
261.88
28,264.42
*190 Petitioner has failed to show that the respondent's disallowance of any additions for the taxable years ended June 30, 1952, 1953, and 1954, was an abuse of his discretion. For the taxable years ended June 30, 1951 to 1954, inclusive, the net income of petitioner (per returns), and the dividends paid were as follows: F/y ended
Net income
Dividends
6/30
reported
paid
1951
$129,267.80
$15,000
1952
141,172.14
10,000
1953
158,235.06
10,000
1954
10,266.73
0
Petitioner's earned surplus (per books), unadjusted for income taxes paid, income taxes paid, and the corrected earned surplus, are as follows: Surplus
Income
Corrected
F/y ended
per
taxes
earned
6/30
books
paid
surplus
1951
$223,597.37
$72,101.17
$151,496.20
1952
277,992.79
76,634.05
201,158.74
1953
360,234.40
89,637.51
270,596.89
1954
278,687.32
2,341.79
276,345.53
Petitioner's net income, accrued income taxes, and the section 102 undistributed net income as determined by the respondent were as follows: Corrected
Accrued
Section 102
F/y ended
net
income
undistributed
6/30
income
taxes
net income
1951
$141,787.38
$ 79,853.12
$46,932.26
1952
167,110.91
105,508.52
51,602.39
1953
191,678.07
124,596.25
57,081.82
1954
33,640.67
10,713.56
22,927.11
*191 In determining the section 102 undistributed net income for each of the taxable periods involved, the respondent took into consideration only the actual dividends paid. If the payments of so-called interest made in the taxable years in question are recognized as additional distributions in the nature of dividends, the corrected section 102 undistributed net income would be as follows: Additional Dis-
Corrected sec-
tributions in
tion 102 undis-
F/y ended
the nature of
tributed net
6/30
dividends
income
1951
$11,969.99
$34,962.27
1952
15,757.00
35,845.39
1953
15,504.77
41,577.05
1954
15,242.37
7,684.74
In the fiscal year ended June 30, 1952, petitioner made investments in the stock of United States Steel Co. and Standard Oil of New Jersey in the amount of $41,147.50. These stocks were sold in 1955. The surtax brackets of the individual shareholders of the petitioner for the calendar years 1951 to 1954, inclusive, were as follows: 1951
1952
1953
1954
Harold F. Stratton
60%
54%
54%
47%
Marguerite S. Nobles
35%
38%
42%
34%
Mark E. Stratton
43%
48%
48%
43%
Robert S. Nobles
30%
38%
42%
38%
*192 If one-fourth of the section 102 undistributed net income as found herein, was distributed to each of petitioner's stockholders, their respective gross income as reported would be increased in each of the taxable years 1951 to 1954, inclusive, by the following amounts: 1951
1952
1953
1954
$8,740.59
$8,961.35
$10,394.26
$1,921.18
The redemption of the 1,000 shares of its capital stock in September 1950, was not in furtherance of the petitioner's business. Petitioner was availed of during the fiscal years ended June 30, 1951, 1952, 1953, and 1954, for the purpose of preventing the imposition of surtax upon its shareholders through the medium of permitting earnings and profits to accumulate instead of being divided and distributed. On its income tax return for the fiscal year ended June 30, 1955, petitioner claimed a deduction of the amount of $14,969.36, representing alleged interest payments on the promissory notes delivered in connection with the redemption of the 1,000 shares of its capital stock in September 1950. Opinion LeMIRE, Judge: The first issue involves the propriety of respondent's action in disallowing the amounts *193 of $11,969.99, $15,757, $15,504.77, and $15,242.37, paid by petitioner in the fiscal years ended June 30, 1951 to 1954, inclusive, and claimed as deductions representing interest payments on the three promissory notes executed and delivered in connection with the redemption of 1,000 shares of its capital stock, constituting 50 per cent of its issued and outstanding shares. Section 23(b) of the 1939 Code provides for a deduction of "All interest paid or accrued within the taxable year on indebtedness * * *." The section is designed to permit of the deduction of genuine interest on a genuine indebtedness. Charles L. Huisking & Co., Inc., 4 T.C. 595, 600. Petitioner is a West Virginia corporation and under the corporation laws of that state a corporation is prohibited from using its funds or property for the purchase of its own shares of capital stock when such use would cause any impairment of the capital stock of the corporation. West Virginia Code 1955, section 3051. In the annotations under section 3051 of the West Virginia Code, it is stated that the language of the section was patterned after the provisions of the Delaware Corporation law, and most of the cases *194 cited are Delaware authorities. In Acker v. Girard Trust Co., et al., 42 Fed. (2d) 37 (CA-3), involving an agreement of a corporation to repurchase its own shares, the court, in construing the Delaware law prohibiting the use of corporate funds to purchase its own shares where such use impaired its capital, held that the agreement was unenforceable. In United Thacker Coal Co. v. Peyton Lumber Co., et al., 15 Fed. Supp. 40, the court in construing section 3051 of the West Virginia Code held that a purchase by a corporation of its own stock which impaired its capital stock was ultra vires and void. In Ashman, et al. v. Miller, et al., 101 Fed. (2d) 85, in construing the Delaware statute, the court stated that the language of the section permitted only the use of the surplus of the corporation for the purpose of acquiring its own capital stock. Cf. Jarroll Coal Co., Inc. v. Lewis, et al., 210 Fed. (2d) 578, which involved a construction of the West Virginia statute here in question. As of June 30, 1950, the capital stock of petitioner consisted of 2,000 shares of the par value of $100 per share. Petitioner's surplus as shown *195 on the balance sheet at that time was $132,527.53. The agreement to redeem 50 per cent of its issued and outstanding shares at a price of $450 per share, or an aggregate consideration of $450,000, caused an obvious impairment of petitioner's capital stock. Petitioner contends that as its fixed assets had appreciated in value by approximately $1,000,000, the purchase did not impair its capital stock. We find no merit in such contention. We think the term "surplus" must be taken to exclude unearned surplus or that represented by mere appreciation in value. In Edward v. Douglas, 269 U.S. 204, 214, it is said: "* * * The word 'surplus' is a term commonly employed in corporate finance and accounting to designate an account on corporate books * * *. The surplus account represents the net assets of a corporation in excess of all liabilities including its capital stock. This surplus may be 'paid-in surplus,' as where the stock is issued at a price above par. It may be 'earned surplus,' as where it was derived wholly from undistributed profits. Or it may, among other things, represent the increase in valuation of land or other assets made upon a revaluation of the company's *196 fixed property * * *." In LaBelle Iron Works v. United States, 256 U.S. 377, 393, sustaining valuations at cost, the court said: "* * * There is a logical incongruity in entering upon the books of a corporation as the capital value of property acquired for permanent employment in its business and still retained for that purpose, a sum corresponding not to its cost but to what probably might be realized by sale in the market. It is not merely that the market value has not been realized or tested by sale made, but that sale cannot be made without abandoning the very purpose for which the property is held, involving a withdrawal from business so far as that particular property is concerned. * * *" In the instant case, there has been no revaluation, but merely some expert opinion testimony that the value of the plant was in excess of $1,000,000. It is well settled that one who seeks the benefit of a statute must bring himself clearly within the terms of the statute which grants the deduction. New Colonial Ice Co., Inc. v. Helvering, 292 U.S. 435; *197 Interstate Transit Lines v. Commissioner, 319 U.S. 590. Petitioner has the burden of showing that there is a valid and legal obligation existing giving rise to a genuine indebtedness. Petitioner contends that the promissory notes given in redemption of its own shares created a valid and binding obligation, since the transaction did not render the corporation insolvent. In determining whether a given transaction is one beyond the powers of a corporation, insolvency, either in equity or under bankruptcy, is not a test to be employed. The redemption of petitioner's own capital stock impaired its capital stock, and under the cited authorities construing the applicable corporation law of West Virginia, the agreement to redeem was ultra vires and void. The agreement therefore created no enforceable obligation and no valid indebtedness arose. The payments of so-called interest did not constitute genuine interest deductible under section 23(b) of the Internal Revenue Code of 1939. So holding, we find it unnecessary to discuss the respondent's alternative contention, that while the transaction was cast in the form of a purchase of shares of petitioner's *198 capital stock, it, in substance, was an agreement to pay an annuity to the then holders in consideration of the surrender of their shares to the corporation. The respondent's disallowance of the so-called interest payments as not constituting deductible interest is sustained. The next issue presents the question whether the respondent properly determined that petitioner was subject to surtax imposed under section 102 of the Internal Revenue Code of 1939 for each of the taxable periods involved. The question is one of fact. Helvering v. Chicago Stock Yards Company, 318 U.S. 693; Lion Clothing Co., 8 T.C. 1181. Petitioner concedes it has the burden of showing the respondent's determination was erroneous. The respondent's position is based primarily on the premise that petitioner was "availed of" by its shareholders for the purpose of avoiding surtaxes upon themselves. Section 102(a). The record shows that prior to September 1950 the petitioner's issued and outstanding shares of capital stock, consisting of 2,000 shares, was held equally by the Miller and Stratton families. All the corporate officers and the majority of the directors *199 were members of the Stratton family. Since the management and the disposition of the corporate net profits was under control of the Strattons', it is understandable that the Miller interest desired that the corporation's assets or the stock be disposed of so that they would not be dependent upon such dividends as the Strattons declared and paid. It is, likewise, understandable why the Strattons preferred to retain their investment. Some negotiation looking to a sale of the plant or the stock was carried on by the president at a sale price greatly in excess of the price which the Strattons were willing to have the corporation agree upon, to redeem the Miller interests. George Nicholson, a mutual friend and a certified public accountant, who had charge of the corporation's and the individual stockholders income tax returns was contacted for the purpose of working out a plan that would be mutually beneficial to all the stockholders. The plan proposed by Nicholson and approved by the stockholders was the redemption by the corporation of the shares of its capital stock held by the Miller interests. The plan provided for the redemption of the 1,000 shares by the corporation for the aggregate *200 consideration of $450,000 with a small cash payment, and promissory notes to which were attached a schedule of installment payments of principal and interest at 4 per cent payable at six month periods. The payments to Edna for her 500 shares were to continue until April 1, 1977, and the payments to her two daughters were to continue to April 1, 1994. If the notes ran to maturity, the total interest payments would amount to $351,069.56, or a liability of principal and interest in the aggregate amount of $801,069.56. Each note contained a provision limiting the payment of future dividends on the remaining capital stock and also a provision permitting the acceleration of payments of both principal and interest after April 1, 1961, with adjustments accordingly. No corporate purpose was achieved by petitioner's redemption of its shares, except such tax savings as might result from a deduction of the interest payments on the notes. However, the plan purported to assure the Strattons the entire ownership and control of petitioner and purported to assure the Miller family a fixed and steady income, in lieu of dividends, for a long period of years. The record shows the rates at which the *201 respective stockholders of petitioner were taxed on the income they reported. If all the earnings and profits had been distributed instead of being accumulated, the taxable rates of the stockholders would have been increased considerably. Since the ratio of tax on section 102 undistributed net income is only 27 1/2 per cent, it is apparent that the plan adopted would be a profitable one for the stockholders even if the section 102 surtax liability was successfully imposed on petitioner. We think it is reasonable to assume that Nicholson, who authored the plan, was aware of such tax-saving results, and that such information was also conveyed to the stockholders and largely motivated the adoption of the plan. Petitioner contends that the evidence shows that the accumulation of its earnings and profits was necessary and reasonable to provide working capital and for contemplated improvements to its plant and facilities. There is some testimony to the effect that in the fiscal year 1954, an addition to petitioner's plant was being planned at an estimated cost of $100,000. At the time of the hearing of this proceeding in March 1958, the sum of $20,000 had been appropriated for that purpose. *202 The redemption of 50 per cent of its capital stock and the investment of the sum of $41,147.50 in 1952, in the stock of other corporations which stock was not sold until 1955, is, we think, inconsistent with a plea that the accumulation of funds is justified for legitimate business needs. The respondent relies heavily upon the case of Pelton Steel Casting Co., 28 T.C. 153, affd. 251 Fed. (2d) 278, certiorari denied 356 U.S. 958. Petitioner attempts to distinguish the Pelton case, and contends that the instant case falls within the ambit of Dill Mfg. Co., 39 B.T.A. 1023, and Gazette Pub. Co. v. Self, 103 Fed. Supp. 779. In the instant case, as in the Pelton case, supra, the facts show that by the redemption of its own shares no corporate purpose was served, but show a purpose to prevent the imposition of surtax upon its shareholders. Where the intent to avoid surtaxes clearly appears, the corporation is availed of for the proscribed purpose and justifies the imposition of the statutory penalty. In our opinion the rationale of the Pelton case, supra, is clearly applicable to the case at bar and will be followed as *203 a controlling authority. The cases relied upon by petitioner were considered and distinguished in the Pelton case, and no purpose would be served by again reviewing them. In computing the section 102 undistributed net income, the respondent recognized only the dividends actually paid by petitioner. We think the payments of so-called interest, having been made under the plan, in good faith, and in the belief that the agreement of petitioner to redeem its shares was enforceable, such payments should be treated as distributions in the nature of dividends. Emanuel N. (Manny) Kolkey, 27 T.C. 37, affd. 254 Fed. (2d) 51. The section 102 undistributed net income has been adjusted to reflect such distributions. We hold that petitioner has not carried its burden of showing that it was not availed of during the fiscal years ended June 30, 1951 to 1954, inclusive, for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting earnings and profits to accumulate instead of being divided or distributed. The respondent's imposition of the section 102 surtax is therefore sustained. Another issue involves the propriety *204 of the respondent's action in disallowing certain expenditures for which a deduction was claimed as ordinary business expenses for repairs. Section 24(a) of the 1939 Code provides: "SEC. 24. ITEMS NOT DEDUCTIBLE. "(a) General Rule. - In computing net income no deduction shall in any case be allowed in respect of - * * *
"(2) Any amount paid out * * * for permanent improvements or betterments made to increase the value of any property or estate, * * * "(3) Any amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made;" The regulations, in substance, provide that the cost of incidental repairs which neither materially add to the value of the property, nor appreciably prolong its life, but keep it in ordinary operating condition, may be deducted as an expense. Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property should be added to the capital account, or charged against a depreciation reserve if such account is kept. Regulations 118-29.23(a)-4. The question as to whether the repair is incidental and the cost deductible as an ordinary *205 expense or is a capital expenditure and nondeductible is one of fact, depending on the character, the extent, and the permanency of the work accomplished by the expenditure. As to the items now in controversy, we have made ultimate findings of fact based upon the purpose and effect of the expenditures which are decisive of this issue. We think a detailed discussion of each separate item involved would serve no helpful purpose. The final question presented is whether the respondent erred in disallowing the additions to petitioner's bad debt reserve for the taxable years ended June 30, 1952 to 1954, inclusive. Petitioner's accounts receivable at the close of each year, the additions to reserve (per return), the chargeoffs, and the balance of the bad debt reserve are as follows: F/y Ended
Accounts
Additions Per
Balance
June 30
Receivable
Return
Chargeoffs
of Reserve
1951
$120,856.91
0
$1,147.99
$ 7,492.61
1952
109,369.89
$7,879.08
1,314.60
14,136.94
1953
118,015.17
7,308.68
0
22,760.22
1954
92,169.36
5,766.08
261.88
28,264.42
The respondent disallowed the entire additions to the bad debt reserve claimed *206 by petitioner as excessive in view of its collection experience. At the time of petitioner's organization on June 1, 1947, it took over the partnership bad debt reserve of $9,477.69. From that time until the fiscal year ended June 30, 1954, petitioner's total chargeoffs were in the amount of $3,977.54. During the same period petitioner increased its bad debt reserve to $28,264.42. During the taxable periods in question, petitioner's bad debt losses totaled only $1,576.48. Section 23(k)(1) of the Code of 1939, allows, in the discretion of the Commissioner, a reasonable addition to the bad debt reserve. Petitioner has the burden of showing that the Commissioner's determination is an abuse of his discretion and arbitrary. In support of petitioner's position that its claimed additions to its bad debt reserve was reasonable, it is contended that during the Korean War it took on a number of new accounts from customers whose credit rating was unknown, and it had some customers who were delinquent in payments, and the corporate officers felt that additional debt reserves should be set up to cover questionable accounts. Petitioner was still doing business with its delinquent customers. *207 One of the factors applied in determining whether the addition to the bad debt reserve is reasonable is the petitioner's prior record. Mill Factors Corporation, 14 T.C. 1366. This record shows that petitioner's customers were largely manufacturing concerns. Petitioner's debt loss, as revealed by the facts, indicate its collection experience was excellent. From a viewpoint of sound business management it may be wise to accumulate surplus funds against future contingencies, but that is not the function of a bad debt reserve contemplated by section 23(k)(1) of the Code. S. W. Coe & Co. v. Dallman, 216 Fed. (2d) 566. In the light of this record we are convinced that petitioner has not carried its heavy burden of showing that the Commissioner has abused his discretion or acted arbitrarily in disallowing the claimed additions to the reserve for bad debts as excessive. Therefore, the respondent's determination is sustained. The parties are agreed that pursuant to the Court's opinion, the subsidiary issues as to the net operating loss carry-back from the fiscal year 1955 to the taxable fiscal year 1954, and the correct excess profits tax income for the years *208 ended June 30, 1951, 1952, and 1953, can be taken care of under Rule 50. Decision will be entered under Rule 50. Footnotes
*. Note: The record contains no explanation of the differential of $10.↩