426 Pa. 377 (1967)
Southeastern Pennsylvania Transportation Authority
v.
Philadelphia Transportation Co., Appellant.
Supreme Court of Pennsylvania.
Argued March 14, 1967.
July 27, 1967.
*378 *379 *380 Before BELL, C.J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.
Philip Price and Arnold R. Ginsburg, with them George J. Miller, and Dechert, Price & Rhoads, for Philadelphia Transportation Company, appellant.
Francis T. Anderson, for appellants.
*381 Daniel B. Pierson, V, with him Raspin, Espenshade, Heins, Erskine & Stewart, for appellant.
Edward G. Bauer, Jr., City Solicitor, with him Matthew W. Bullock, Jr., Second Deputy City Solicitor, for appellees.
William T. Coleman, Jr. and Lewis H. Van Dusen, Jr., with them Richardson Dilworth, J. Alan Kugle, David P. Bruton, and Dilworth, Paxson, Kalish, Kohn & Levy, and Drinker, Biddle & Reath, for appellee.
Eugene John Lewis, for amicus curiae.
OPINION BY MR. JUSTICE COHEN, July 27, 1967:
These appeals involve two separate actions concerning the same matters. The first (appeals numbers 188 and 194) presents a petition seeking a declaratory judgment, which action was brought June 18, 1965 by Southeastern Pennsylvania Transportation Authority (SEPTA) and the City of Philadelphia against Philadelphia Transportation Company (PTC) and its subsidiaries. Plaintiffs' petition requested the court to determine (1) the right of SEPTA as the city's assignee to purchase the assets of PTC pursuant to an option to purchase contained in paragraph Eleventh of an agreement dated July 1, 1907, as amended; (2) the meaning of the purchase price formula set forth in the agreement; and (3) such other matters necessary to effect the transfer of PTC's property. Thereafter, certain minority shareholders of PTC petitioned to intervene as defendants, and their petition was granted by this Court on May 13, 1966. After hearing extensive testimony, the trial court held on July 14, 1966 (approved by the court en banc on September 16, 1966) that (1) the city's reserved right of purchase under the *382 agreement of 1907, as amended, was valid; (2) the city's assignment of that right to SEPTA was valid; (3) SEPTA, as the city's assignee, must pay to PTC a sum composed of the following amounts reflected by PTC's balance sheet as of the date of payment: (a) an amount equal to PTC's then outstanding bond, mortgage and ground rent indebtedness; (b) an amount equal to ten dollars per share for all then outstanding common stock of PTC; and (c) the amount of the then "Retained Earnings" of PTC.
The second action (appeals numbers 189 and 192) involves a complaint in equity filed July 8, 1966 by Edmond G. Thomas (a taxpayer) and PTC against the City, the Mayor, and the Commissioner of Public Property of Philadelphia, and against SEPTA. Plaintiffs' complaint prayed, inter alia, for an injunction restraining defendants from carrying out the agreement of June 8, 1965, whereby the city assigned to SEPTA its right to purchase PTC. The city and SEPTA filed preliminary objections, and on September 16, 1966 the complaint was dismissed for the reasons stated in the opinion of the court en banc filed that day in the declaratory judgment proceeding.
The lower court's opinion, we believe, sets forth a comprehensive well-reasoned analysis of the problems involved and proposes, in every instance, a solution which this Court deems fair and proper. Accordingly, we recommend to the interested reader that he closely study that opinion, for we intend here only to highlight the matters of importance.
In 1902, the Philadelphia Rapid Transit Company (PRT) was formed as a consolidation of the various transit systems previously existing in Philadelphia. On its own or through subsidiaries, PRT leased, owned and operated high speed lines, and bus and taxi facilities throughout the city. On July 1, 1907, the city and PRT entered into a written agreement which provided *383 in Section Eleventh: "The City reserves the right to purchase all the property, leaseholds and franchises of the Company, subject to all indebtedness . . . upon July 1st, 1957, or upon the first day of any July thereafter by serving six months' notice . . . [for] an amount equal to par for its capital stock then outstanding, to wit: the thirty million (30,000,000) dollars of capital stock now authorized plus any additional capital stock issued with the consent of the City hereunder. . . ."
In the decades that followed, PRT suffered financial misfortune. Finally, in 1938 the Pennsylvania Public Utility Commission approved a reorganization plan filed by PRT. On May 20, 1939, City Council consented to the reorganization and enacted an ordinance authorizing the execution of an amendment to the 1907 agreement. On June 12, 1939, the amendment was executed. It made five major changes in Section Eleventh:
1. The 1939 agreement enabled the city to purchase the entire transportation system (since PTC, unlike PRT, owned the leaseholds and franchises of the underliers and traction companies), not just PRT's leaseholds and franchises, as provided in the 1907 agreement.
2. It allowed the city to purchase PTC's assets free and clear and not subject to PTC's indebtedness.
3. It permitted the city to exercise its reserved right of purchase on any July 1, with 6 months' notice to PTC.
4. The formula for determining the purchase price was changed to the following: a. The amount of PTC's outstanding bonds, mortgage and ground rents; b. The par value of PTC's outstanding preferred stock; c. $10 per share of PTC's outstanding common stock; d. The amount of PTC's then undistributed corporate surplus.
5. The city reserved the right of condemnation.
*384 The 1907 agreement was further amended on October 26, 1950, July 1, 1957, July 5, 1962 and February 25, 1965.
PTC argues that the purchase option was void under the rule against perpetuities. As the lower court said: "The best way to state PTC's argument is to state its best case.
"In Barton v. Thaw, 246 Pa. 348 (1914), plaintiffs were children of Joseph Barton, who had conveyed coal under certain land to Thaw's predecessors in title, by a deed that provided that `And in case, the said parties of the second part, their heirs or assigns, should at any future time whatsoever desire to purchase any of said land in fee simple, then the said parties of the first part, for themselves, their heirs or assigns, hereby covenant and agree to sell and convey the same to the said parties of the second part, their heirs or assigns, at a price not exceeding one hundred dollars per acre.' (246 Pa. at 350).
"The sale of the coal was admittedly good, but plaintiffs claim, by a bill to remove a cloud upon title, that the option to purchase the surface of the land was void because in violation of the rule against perpetuities. `It [was] conceded by counsel that the case presents for the first time to the courts of Pennsylvania the question whether an option or right to purchase land, unlimited in point of time, violates the rule against perpetuities, and therefore is void. . . .' (246 Pa. 350-351). The lower court in a careful opinion held that the option did violate the rule, and the Supreme Court affirmed.
"PTC's argument is that the City's reserved right of purchase is also an option `unlimited in point of time,' and therefore it is also void. It has been seen, above, that indeed the City's right of purchase is thus unlimited. Is it, however, therefore void?"
*385 The historical purpose of the rule against perpetuities was to destroy serious hindrances to the beneficial and prosperous use of property. PTC claims that under Barton v. Thaw, supra, Pennsylvania law recognizes a blanket condemnation of all remote options. That is not so, for Barton stated at 246 Pa. 364 that its result is dependent on the interests of the community at large. In this case, the danger of fettering the free use of property is outweighed by considerations of public concern and welfare.
Furthermore, the purchase option is not an impress on land but is solely a contract right not within the rule against perpetuities. In Philadelphia v. Philadelphia Transportation Co., 386 Pa. 231, 126 A. 2d 132 (1956), this Court stated that until exercised the option gave the city no right in PTC's property as such, but merely a contractual right. With regard to exclusively contractual rights, the Restatement of Property, § 401 provides, "A transaction which is exclusively contractual is not subject to the rule against perpetuities." This Court took the same view in Caplan v. Pittsburgh, 375 Pa. 268, 100 A. 2d 380 (1953).
Moreover, even assuming that the purchase option fell within and did violate the common law rule against perpetuities the Estates Act of 1947, Act of April 24, 1947, P.L. 100, 20 P.S. § 301.4 makes that rule inapplicable. Sub-sections 4(a) and (b) provide, "No interest shall be void as a perpetuity except . . . [u]pon the expiration of the period allowed by the common law rule against perpetuities as measured by actual rather than possible events. . . ."
With regard to this matter, the lower court stated: "Thus, if an option void at common law actually vests within 21 years, it is valid even though it might not have vested that soon. Or, as Bregy puts the point, at page 5307 of his treatise on the Estates Act: `. . . such agreements will no longer be void from the beginning *386 as in Barton v. Thaw. Under the statute an unlimited option should be allowed to run until the expiration of the permissible period, and stricken down only if it remains unexercised at that time.' (Footnotes omitted.)
"If the City and PTC had made no further agreements after the Agreement of 1939, the Estates Act of 1947 would not be pertinent. However, as was seen in discussing the duration of the City's reserved right of purchase, the City and PTC made the Agreements of 1957, 1962, and 1965. The importance of this fact appears when one considers Section 21 of the Estates Act, 20 P.S. § 301.21. This provides that the Estates Act `. . . shall take effect on the first day of January, one thousand nine hundred forty-eight, and [except in respects not here material] shall apply only to conveyances effective on or after that day. As to conveyances effective before that day, the existing laws shall remain in full force and effect.'"
Section 1 of the Estates Act defines a conveyance as ". . . an act by which it is intended to create an interest in real or personal property whether the act is intended to have inter vivos or testamentary operation." If the 1957 agreement is a conveyance under that definition, the Estates Act of 1947 applies, and the "wait and see" rule was complied with, for the option was in fact exercised within the time limitation of the rule against perpetuities dating from July 1, 1957.
Based on the premise that the city's reserved right of purchase expired July 1, 1957, and was extended by agreement to December 31, 1964, PTC further argues that SEPTA's attempt to exercise the purchase option was ineffective because it was not timely and that the option period was not further extended by the 1965 agreement because the latter agreement was never approved by PTC's shareholders. We agree with the lower court's conclusion that the premise of those arguments is unsound because under the 1939 agreement *387 the reserved right of purchase remained effective until exercised.
The intervening minority shareholders argue that the agreement of 1965 was not intended to extend the reserved right of purchase, but by "fraud, accident or mistake" the 1965 agreement failed to express this limitation. Again, we agree with the court's evaluation of intervenors' evidence in this respect to the effect that they were unsuccessful in proving fraud, accident or mistake. Rather, the testimony of their witnesses tended to prove that the city intended to preserve the option to purchase PTC, and not to allow it to expire so that there was no mutual mistake; nor were the representatives of PTC misled by the city invalid because it was made without public auction. during negotiations of the 1965 agreement.
PTC asserts that the assignment to SEPTA was The lower court carefully analyzed this question in the following manner.
Section Eleventh of the 1907 agreement, which was carried over into the 1939 agreement, provides that the city may assign its reserved right of purchase and that the company may become a bidder for that right. On June 8, 1965, the city made the assignment to SEPTA, which exercised the right on the same day. No notice of the assignment was given to PTC, nor was a public auction or competitive bidding permitted.
PTC does not argue that the agreement of 1907 requires public auction because it says "may be put up at public auction." (Emphasis supplied.) Instead, PTC argues that the Home Rule Charter of 1951 requires a public auction. The Home Rule Charter is, however, irrelevant.
Section 11 of the First Class City Home Rule Act, Act of April 21, 1949, P.L. 665, 53 P.S. § 13111 provides that no contract existing at the time of adoption of any home rule charter shall be affected thereby. Since *388 the agreement of 1939 does not require public auction, the Philadelphia Home Rule Charter cannot affect that agreement no matter what its says about public auctions.
Moreover, public policy does not require assignment by public auction. The reason for requiring competitive bidding is to prevent private business from gaining favors of government or from corrupting government. Here, the assignee is another government agency and the reasons in favor of bidding competitively are absent.
The most perplexing problem concerns interpretation of the purchase price formula. Four factors are involved:
"1) an amount equal to the sum of the face amount, or call price if any, and accrued interest of all then outstanding bonds of, and all then outstanding prior lien bonds, mortgages and ground rents on the property of, Company and its wholly-owned subsidiaries. . . .;
"2) plus the par value of all then outstanding preferred stock of Company. . . .;
"3) and an amount equal to ten (10) dollars per share for all then outstanding common stock of Company.. . .;
"4) and the amount of the then undistributed corporate surplus, if any, of Company."
The word "then" refers with respect to each factor to the particular July 1st named in the notice of intent to exercise the option. SEPTA named July 1, 1966 as the settlement date, and the parties extended this date to January 1, 1967.
The first three factors present no problem of interpretation or computation. The amount of the outstanding bonds, mortgages and ground rents can readily be ascertained; there is no outstanding preferred stock because PTC converted its preferred stock to common stock in 1955; and the amount of outstanding *389 common stock can be determined without difficulty. Only the meaning of "undistributed corporate surplus" is at issue.
PTC and the minority shareholders propose that "undistributed corporate surplus" is the excess of the appraised value of PTC's assets over the value of its liabilities and capital as of the settlement date. The trial court rejected this argument and held that the fourth factor of the formula was reflected on PTC's balance sheet figure as "Retained Earnings." As the court observed: "One of the great attractions of a purchase price formula is that the buyer can figure out what the price will be before he exercises his option and commits himself to purchase. A valuation proceeding after the option is exercised defeats this purpose.
"This is so on general principles. Thus the Supreme Court, in Philadelphia v. Phila. T. Co., 386 Pa. 231, 239 (1956), said of the purchase price formula: `. . . the price to be paid for the property according to the option is determinable by a fixed formula whereas a condemnation proceeding must depend upon the uncertain decision of a fact-finding tribunal as to the value of the property then being acquired.' (Footnote omitted.)
"In addition, the history of the underliers and PRT, the other provisions of the agreement, and the legislative history of the formula itself, all demonstrate that `undistributed corporate surplus' is not a valuation but a balance sheet figure.
. . .
"Moreover, the other provisions of the Agreement of 1939 gave the City control over the other factors of the formula. Section First of the Agreement of 1907, which was not amended but continued in effect by the Agreement of 1939, provided that `No further increase of capital stock or funded indebtedness . . . *390 shall be made by the Company . . . without the consent of the City. . . .' Also, if more bonds were issued by the Company, there would be a corresponding increase of assets, which the City would acquire if it exercised its right to purchase. Still further, the City was entitled to representation on the board of directors (Section Fourth of the Agreement of 1907 and Section 1(a) of the Agreement of 1939), and the City Controller was empowered to examine the Company's books (Section Fifth of the Agreement of 1907, continued in effect by the Agreement of 1939).
"Thus PTC's argument comes down to an assertion that of the four factors of the formula, all could be controlled by the City, and could be determined by an examination of the balance sheet, before the City decided whether to exercise its right of purchase, except for one factor  `undistributed corporate surplus.' This assertion is almost self-defeating. In any case, the hearings before the Transportation and Public Utilities Committee of City Council in April and May of 1939 demonstrate that both PRT (seeking the City's consent to be reorganized as PTC) and the City understood the formula to be a simple mathematical calculation based on book figures.
"In essence, what the hearings demonstrate is that PTC's present argument as to the meaning of `undistributed surplus' is based upon a practice precisely contrary to the purpose of the Agreement of 1939. In PTC's present view the 1939 amendment called for PTC to reap the benefits of any increase in the unrealized value of its assets in the event of a sale to the City under the City's option. The hearings make it clear that the formula was to do just the opposite: the City was to reap any increase in the unrealized value of PTC's assets, if, but only if, the City exercised its option and thereby purchased the PTC system as a whole."
*391 By providing for a purchase price formula and by electing to exercise the option to purchase, rather than to proceed by condemnation, SEPTA was assured of being able to determine for itself the price to be paid by an examination of PTC's balance sheet figures, rather than by a lengthy valuation process which would leave the purchase price determination to a fact-finding body. Clearly, "undistributed corporate surplus" is not a valuation, but a balance sheet figure, as are the other three factors.
"Undistributed corporate surplus" is a factor which represents earnings accumulated by PTC rather than earnings paid out as dividends. That language assured the shareholders that when the option was exercised, they would receive so much of the accumulated earnings as were not paid to them as dividends. Had the only class of shareholders of PTC in 1939 been common shareholders, the phrase "retained earnings" or "earned surplus" would have accomplished that purpose. However, PTC had preferred shareholders whose dividend rights upon liquidation were, pursuant to the articles of incorporation, cumulative if, in fact, dividends were earned. Thus, it was possible for PTC to have at the end of a given year earned, accumulated, but unpaid dividends on preferred shares of stock in an amount that would exceed the amount of "earned surplus" (or "retained earnings"). On account of this situation, the draftsmen of the 1939 agreement did not use as a price factor a sum equal to PTC's "then retained earnings," because in such a situation had the option been exercised the common shareholders would have received less than ten dollars per share. The draftsmen clearly desired to insure that the common stockholders received ten dollars a share if the city exercised its option and not a lesser sum because of an obligation by PTC in liquidating to pay preferred *392 shareholders earned, accumulated, but unpaid dividends. Accordingly, so long as there were preferred stockholders "undistributed corporate surplus" meant the greater of PTC's retained earnings or its earned, accumulated, but unpaid dividends as of the settlement date. Since 1955, when PTC converted its preferred stock to common stock, there have been no earned, accumulated, but unpaid dividends. Accordingly, by paying an amount equal to PTC's retained earnings, the city will achieve the purpose of the formula  that the common shareholders get back what they risked: so much of the accumulated earnings as were not paid to them in dividends. And this is what "undistributed corporate surplus" means.
This means PTC's retained earnings, because, in the language of the court below: "PTC's present balance sheet carries two accounts: `Capital Surplus' and `Retained Earnings.' As has just been seen, `undistributed corporate surplus' means a fund available for the payment of cash dividends. Therefore, it includes only PTC's `Retained Earnings' account. It does not include the `Capital Surplus' account because under Pennsylvania law cash dividends cannot be paid from capital surplus. Branch v. Kaiser, 291 Pa. 543 (1928); Berks Broadcasting Co. v. Craumer, 356 Pa. 620 (1947)." (Footnote omitted.)
PTC's retired employees receive pension benefits on a pay-as-you-go basis. PTC has no funded pension plan; pension benefits are paid out of the fare box from current revenues. Actuarial studies reveal that the amounts required to fund past service costs would be approximately $11,939,392 for nonsupervisory retirees and $4,973,304 for supervisory and executive retirees. The parties have stipulated that this $17,000,000 obligation is a present vested liability. The question presented is whether PTC's "undistributed corporate *393 surplus" is extinguished by its obligation to its retired employees. SEPTA's accounting expert testified that minimum standards of accounting principles require that a vested pension liability be carried on the liability side of the balance sheet. PTC did not, in fact, do so because the pension obligation was never funded. Rather, the actuarily determined amount of the obligation was revealed in a footnote to their annual financial reports. SEPTA argues that if this liability were placed on the books, it would eliminate all surplus, because there is no offsetting asset on the books. Consequently, there would be no retained earnings or "undistributed corporate surplus." Accordingly, contends SEPTA, the purchase price need not include any amount representing PTC's "undistributed corporate surplus."
PTC, on the other hand, presented expert testimony justifying its accounting techniques with respect to its pension liability because as a public utility its rates were fixed by taking into account pay-as-you-go pension payments in the rates for the year of payment. Thus, argues PTC, it does not have a fund available for cash dividends (retained earnings), which is part of the purchase price formula.
As the lower court indicated, the accounting testimony is neither necessary nor appropriate to a resolution of this issue. Rather an examination of the agreements is sufficient to dispose of the matter. As the trial court stated: "Section Eleventh of the Agreement of 1907 provided that for a price equal to the par value of PRT's stock the City or its assignee could acquire `all the property, leaseholds and franchises of the Company, subject to all indebtedness now existing or hereafter lawfully created hereunder upon July 1st, 1957. . . .' This was changed by the Agreement of 1939, so that the City or its assignee, upon payment *394 of the formula price provided in that Agreement, would acquire `all the property, leaseholds, and franchises of the Company and its wholly owned subsidiaries upon any first day of July thereafter. . . .' The clause `subject to all indebtedness . . . [etc.]' was eliminated. It follows, therefore, that if SEPTA pays the formula price, it acquires PTC's assets not subject to PTC's obligations, i.e., that SEPTA after the acquisition will not be subject to PTC's pension obligation, which is only another way of saying that SEPTA may not refuse to pay the full formula price by charging against it PTC's pension obligation as though SEPTA would be subject to it." (Footnotes omitted.)
On this point, PTC carries the argument further and contends that SEPTA must not only pay for PTC's retained earnings but also must assume PTC's pension obligation. We have already decided that SEPTA must, under the formula, pay for PTC's retained earnings. It is, however, not required under the agreement of 1939 to assume PTC's pension obligations.
The lower court further concluded that SEPTA may not reduce the purchase price by PTC's cost of financing and organization expenses because the 1939 agreement intended the option price to be a single price for all of PTC's leases, franchises and assets, and SEPTA must pay the full purchase price. We agree.
In addition, the trial court decided that in making payment for "accrued interest of . . . then outstanding. . . mortgages," SEPTA must pay PTC a sufficient amount to compensate PTC for any prepayment penalties PTC is called upon to pay if PTC retires its mortgage debt before the maturity date. Again, we agree.
Finally, the court below held that the date when SEPTA must make payment to PTC be extended for a *395 period of not less than six months after final disposition of this case. This is certainly a reasonable extension in view of the fact that SEPTA will not know with certainty the amount it must pay until this case is finally concluded. It must then be allowed sufficient time to raise the money necessary to effect the purchase.
In appeals number 188 and 194, the judgment is affirmed. In appeals number 189 and 192, the decree is affirmed.
CONCURRING OPINION BY MR. JUSTICE MUSMANNO:
No commercial enterprise can achieve success without manpower. The financial resources of the Philadelphia Transportation Company could never have been amassed without the work of its maintenance and transportation employees. Now that PTC is to be sold, the pension rights of the men who manned the tramway cars and buses, and kept them in running condition, must not be lost or mislaid in a labyrinth of complicated fiscal proceedings.
The lower court properly declared that: "PTC is required to provide for the payment of retired employees' pensions before it may distribute the money that will be received from SEPTA when SEPTA purchases PTC's assets."
The Transport Workers Union of America and Transport Workers Union of Philadelphia, Local No. 234 (known as TWU) correctly point out in their brief that their primary concern is that, out of the purchase price paid by SEPTA to PTC, PTC is required to hold back, and not distribute to the PTC shareholders, a sum equal to the liability due and owing the retired employees. This proposition is eminently just and legally unassailable. What the TWU employees have put into their daily toil is as *396 much a part of the PTC assets as bricks are an integral part of the building of which it consists. Every street car and bus is held together by the perspiration of those who toiled to maintain and operate it.
Thus, the moneys due the retired pensioner is a vested liability which PTC may not shed or cast off. This liability cannot be shifted to another track or derailed and certainly not abandoned. I repeat the lower court's finding, namely, "PTC is required to provide for the payment of retired employees' pensions before it may distribute the money that will be received from SEPTA when SEPTA purchases PTC's assets."
Under this language, which is as plain and clear as a street car passing over a trestle bridge, the money due the retired employees must be deducted from the purchase price and held for the employees' pension fund. Any action which would distribute that fund to anyone other than the PTC pensioners, to whom it belongs, would constitute a contempt of the wording and spirit of decision of the court below. This pension money is in effect a trust fund for the protection of the pensioners and must be respected as such. The pension fund is a bread box for the retired employees. It must be kept safe and secure so that the bread it contains will continue to be fresh and life-sustaining.
In addition, it is clear from the record below that, to the extent that that such fund, deducted from the purchase price, should be insufficient to carry out the pension obligation, SEPTA has a liability in the future to pay that pension obligation, if, for any reason whatsoever, PTC might deplete the amount of the purchase price without fully providing for the pension liability to retired employees.
There is a reservoir of moneys in the amounts payable to PTC under the SEPTA purchase. The pensions must be drawn from that reservoir. The time to *397 end the long-drawn out litigation in this case is now. The employees should not be required to seek with a broken tin cup for water in the desert of any further legal controversy.
I affirm, with the majority of the Court, the order of the court below.
DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:
I dissent for each of the following reasons:

The Option Is Illegal and Void
1. SEPTA's claim is based upon the Option which was contained in the 1907 contract between the City of Philadelphia and Philadelphia Rapid Transit Company (now Philadelphia Transportation Company) and which was assigned by the City to SEPTA for no consideration. This Option violates the Rule against Perpetuities and is void!
In 1907, the City of Philadelphia entered into an Agreement with the Philadelphia Rapid Transit Company. Paragraph Eleventh of this Agreement provided: "The City reserve[s] the right to purchase all the property, leaseholds and franchises of the Company, subject to all indebtedness . . . upon July 1st, 1957, or upon the first day of any July thereafter[*] by serving six months' notice . . . [for] an amount equal to par for its capital stock then outstanding, to wit: the thirty million ($30,000,000) dollars of capital stock now authorized plus any additional capital stock issued with the consent of the City hereunder.. . ."
Complementing this right to purchase, Paragraph First of the Agreement included the provision "nor shall the Company, during said term, part with any of *398 its stocks, leaseholds or franchises without like [City's] consent."
In 1939, the 1907 Agreement was replaced by a new Agreement between the City and the Philadelphia Transportation Company. Paragraph Eleventh of the 1907 Agreement was amended. Although many changes were made by the parties, the most pertinent changes were as follows: The City was given the right to purchase the entire transportation system; it changed the time when the City could exercise its right of purchase from "July 1st, 1957, or upon the first day of any July thereafter" to "any first day of July hereafter." Also, the price that the City was to pay by exercising the right to purchase was changed to a price made up of four factors: (1) the amount of PTC's outstanding bonds, mortgages and ground rents; (2) the par value of PTC's outstanding preferred stock (of which presently there is none); (3) $10 for each share of PTC's outstanding common stock; and (4) "the amount of . . . [PTC's] then undistributed corporate surplus, if any." Furthermore, the City reserved "whatever right to condemn it now has or shall hereafter have," a reservation which was not in the Agreement of 1907.
This 1907 Agreement, as amended by the 1939 Agreement, was amended or extended by Agreements entered into between the City and the PTC in 1950, 1957, 1962 and 1965, the latter two Agreements specifically stating that the extensions were without prejudice to the claim of the PTC that the 1907 Agreement terminated either on December 31, 1964 or on June 30, 1965. The City was thus given the right or option to purchase all of the properties of the PTC without any time limit specifically imposed on this right, and until such purchase option was exercised, the PTC could not sell or alienate any of its property, *399 stocks, leaseholds or franchises without the City's consent. Since the City's interest in the PTC properties would not vest until it exercised its purchase option, which clearly and undoubtedly could be exercised later than the period of 21 years allowed by the Rule against Perpetuities, the Option violates the Rule.
In upholding the City's right to purchase under the Rule against Perpetuities, the majority relies on three grounds. First, the right to purchase is a contractual right to which the Rule does not apply. Second, if the Rule does apply, the extension Agreement of 1957 acted as a "conveyance" to bring it within the Estates Act of 1947 and the so-called "wait and see" rule incorporated therein. Third, the Rule should not operate on the City's right to purchase for reasons of public policy. I find no merit in any of these contentions.
An option is an offer to sell to the optionee or, conversely, a right given to the optionee to buy certain property at or within a stated period of time and for a specified price, and when supported by consideration is a contract. However, the fact that an option gives what amounts in this case to a contractual right does not insulate it from the Rule against Perpetuities.
The leading case on this point is Barton v. Thaw, 246 Pa. 348, 92 Atl. 312 (1914). It involved an option and is squarely in point and controlling. That case arose sur a bill in equity to remove a cloud upon title. In 1881, the owners of land conveyed the coal and other minerals underlying the land to grantees. This conveyance contained an option to the grantees, their heirs or assigns "at any future time whatsoever . . . to purchase any of said land in fee simple . . . at a price not exceeding $100 per acre." Obviously, there was no time limit within which the option had to be exercised.
This Court adopted the lower Court's learned Opinion in which it traced and reviewed the Rule against *400 Perpetuities from its ancient beginnings and held that it was taken from the common law of England and was part of and imbedded in the common law of our Commonwealth.
The Court accurately stated that the Rule against Perpetuities is a restriction against fettering the alienation of property, that under the Rule vesting must take effect within lives in being and 21 years thereafter (including the period of gestation), that the Rule operates as a nullification and destruction of the intention of the parties, and is a peremptory command of law based upon public policy, and that because of the public policy favoring alienability, the Rule must be remorselessly applied. The Court further said (pages 355, 358, 363-4, 365): "`When lives cannot be taken as a measure, the perpetuity period is twenty-one years.' Goodwin on Real Property, 280. `The period of twenty-one years may be taken in gross, that is, limited simply as a space of time, without reference to any minority, and without being preceded by a life or lives in being.' Foulke on Rule against Perpetuities, sec. 340. `If an absolute term is taken, and no anterior term for a life in being is referred to, such absolute term cannot be longer than twenty-one years.' Perry on Trusts, 349. `As to the time within which an executory estate or interest must arise, it is evident that some time limit must be fixed, for if an unlimited time were allowed for the creation of these future and indestructible estates the alienation of lands might be henceforward forever prevented by the innumerable future estates which the caprice or vanity of some owners would prompt them to create. A limit has, therefore, been fixed on for the creation of executory interests, and every executory interest which might, under any circumstances, transgress this limit is void altogether. If no lives are fixed on then the term of twenty-one *401 years only is allowed.' Williams on Real Property (6th Am. Ed.), 317. `The rule is that where the testator fails to avail himself of lives in being, and adopts a term of years, without reference to any life in being, the term cannot extend beyond twenty-one years from his death.' Johnston's Est., 185 Pa. 179.
. . . .
"A privilege to acquire such right [under the option] was given by the Barton deed, but no such right was conveyed thereby. The event upon which the estate is to arise, to wit, the acceptance of the option to purchase, is uncertain, being unconfined as to limit of time. The interest created by this option, therefore, is not vested, but contingent, and is within the rule against perpetuities. In that respect this case differs from one where the owner of land conveys the coal thereunder, with general mining rights and the right to use surface for mining purposes, as in Dewey v. Great Lakes Coal Company, 236 Pa. 498, cited by counsel for the defendants. In a case like that the rights are conveyed by the deed and vest immediately. There a present fixed right of future enjoyment is conveyed, although the right of enjoyment may not be exercised immediately.
. . . .
". . . By its terms the option . . . is limited only by the confines of eternity. We cannot conceive of a more violent breach of the rule against perpetuities. . . . And the rule must be rigidly enforced. In Coggins' App., 124 Pa. 10, Mr. Chief Justice PAXSON designates the rule against perpetuities as `a rule of property founded upon the highest considerations of public policy, and too firmly imbedded in our system of jurisprudence to be disturbed save by an act of assembly.'
. . . .
"3. The option or right to purchase in this case constitutes a cloud upon the title of the plaintiffs *402 which they are entitled in equity to have removed by cancellation."
This Court, in its Opinion in Barton v. Thaw, said (page 366): "The covenant in question was declared to be void because in violation of the rule against perpetuities. We quite agree with the learned court below that it would be difficult to conceive any case which could be deemed more violative of the rule and a greater hindrance to alienation than the one at bar. The case turns very largely upon the character of the interest in the surface which the optionees took under the covenant. If it was a present, fixed and vested interest in the land the rule against perpetuities would have no application. But is a mere option to purchase land, unlimited as to time and indefinite in duration, which may be exercised in ten years, or in a hundred years, or in a thousand years, or which may never be exercised at all, depending upon the wish or pleasure of the optionee, a present vested interest? To ask this question would seem to answer it. In no proper legal sense can a mere privilege of exercising a future right to purchase be deemed a present vested interest in land. The optionees may never exercise their option, and failing to do so, they would never acquire a vested interest in the land."
Barton v. Thaw has been cited with approval in Mather Estate, 410 Pa. 361, 189 A. 2d 586 (1963); Newlin Estate, 367 Pa. 527, 80 A. 2d 819 (1951); Lockhart's Estate, 306 Pa. 394, 159 Atl. 874 (1932); Lilley's Estate, 272 Pa. 143, 116 Atl. 392 (1922); Vilsack v. Wilson, 269 Pa. 77, 112 Atl. 17 (1920); Green v. Green, 255 Pa. 224, 99 Atl. 801 (1916); Caruthers v. Peoples Natural Gas Company, 155 Pa. Superior Ct. 332, 38 A. 2d 713 (1944); Morgan v. Griffith Realty Co., 192 F. 2d 597 (10th Cir., 1951); and Middleton v. Western Coal & Mining Co., 241 F. Supp. 407 (W.D. *403 Ark.). See also: Lewis Estate, 349 Pa. 571, 37 A. 2d 482 (1944); Ledwith v. Hurst, 284 Pa. 94, 130 Atl. 315 (1925).
The Majority has ignored this clear and well settled law of Pennsylvania and relies instead on § 401 of the Restatement of the Law of Property, which states that "A transaction which is exclusively contractual is not subject to the rule against perpetuities." Of course, this is not controlling but even if it were, an examination of the illustrations and comment under § 401 clearly and without the slightest doubt demonstrates that the section does not apply to the type of contractual right asserted here by SEPTA. The rationale of § 401 is set forth in the comment to that section: "a. Rationale. The rule against perpetuities has as its sole objective the prevention of `inconvenient fetterings of property' (defined in § 370, comment c). When a transaction is `exclusively contractual' (defined comment b) it involves no fettering of any property and hence there is no occasion for applying the rule against perpetuities thereto."
But an option does involve the fettering of property and certainly the 1907 Option provision did! As Corbin points out in his Treatise on Contracts (Vol. 1A, page 481): "When an owner, by an Option Contract, gives to a promisee an Option to Purchase for a stated period, he has restrained alienation for that period,. . ." That is precisely why this Court held in Barton v. Thaw, 246 Pa., supra, that the Rule against Perpetuities applies to option contracts. The 1907 City-PTC Agreement not only gives the City a right, during an unlimited future, to purchase the franchises and other properties of the PTC, but further prohibits the PTC from "parting with any of its stocks, leaseholds or franchises without [the City's] consent." It is difficult to imagine a greater fettering of alienation of property.
*404 The restrictive effect of the option in this case is further emphasized by the fact that, as the City and SEPTA claim, the City's right to purchase could be exercised at any time in the future without limit. Could any statement or contention more clearly demonstrate that this Option unquestionably violates the Rule? Poetically expressed, the Option may be exercised at any time before the stars are old and the sun grows cold and the leaves of the judgment book unfold.
The majority Opinion next states that "If the 1957 agreement is a conveyance under that definition, the Estates Act of 1947 applies, . . . for the option was in fact exercised within the time limitation of the rule against perpetuities dating from July 1, 1957." The Estates Act of 1947 took effect January 1, 1948 and applies "only to conveyances effective on or after that day. As to conveyances effective before that day, the existing laws shall remain in full force and effect."
The 1957 Agreement does not give the City a new option or right to purchase, nor does it expressly modify the original Option given in 1907. Furthermore, (1) an option has never heretofore been "a conveyance," and (2) an option does not create a legal or equitable title in property: Synes Appeal, 401 Pa. 387, 394, 164 A. 2d 221 (1960); and (3) an option is not "a conveyance" as defined in the Estates Act of 1947. It is clear that prior to any exercise of the Option by the City under Paragraph Eleventh of the 1907 Agreement, the optionee had no interest, legal or equitable, in or to the property subject to the Option, and a right which is void ab initio cannot be revived by one or even by both of the parties.
Finally, the Majority states that the Option should be upheld on the grounds of public policy. It disposes of the Rule against Perpetuities in two sentences: *405 ". . . Barton stated at 246 Pa. 364 that its result is dependent on the interests of the community at large. In this case, the danger of fettering the free use of property is out-weighed by considerations of public concern and welfare." The Majority has mistaken the principle of public policy and has blindly put the shoe on the wrong foot. SEPTA, if ably managed (which, because of its multifarious functions and the varied and complicated problems which are certain to arise, is doubtful of accomplishment) is a desirable objective and a worthwhile public policy, but that does not and cannot legalize the violation of any law or the destruction or abolition of the public policy of the Commonwealth, or the evasion of the many controlling decisions of this Court to the contrary. The Majority cites no authority to support it and obviously proceeds on the recently adopted theory that a worthy objective validates and Constitutionalizes anything and everything, and every case is to be decided on a personal ad hoc basis. This substitutes uncertainty and confusion for certainty, clarity and stability, as well as for long-established and well-settled law, and borders on the ridiculous. I believe, although no one can be sure from the majority Opinion, that the practical result of that Opinion on this point is to judicially exterminate the Rule against Perpetuities, which it now writes off as "gone with the wind."
Barton v. Thaw, 246 Pa., supra, makes it crystal clear that there are compelling public policy reasons for not permitting unlimited restraints on alienation of property. Furthermore, the public interest of the City and also of SEPTA is adequately and completely protected by the fact that the City and SEPTA may condemn the entire transportation system if, in the public interest, either so desires.
In addition, the Majority conveniently overlooked the fact and the law that neither a Municipality nor *406 an Authority is a Sovereign, and what might apply to a Sovereign does not apply to a Municipality or an Authority. A Municipality, not only in its private or proprietary but even in its governmental capacity, has no vested rights in its functions or powers and is Constitutionally subject to change, repeal or total abolition at the will of the Legislature. In Lighton v. Abington Twp., 336 Pa. 345, 9 A. 2d 609, the Court, in an Opinion by Justice LINN, said (pp. 352, 353): "In Commonwealth v. Moir, 199 Pa. 534, at p. 541, 49 A. 351, MITCHELL, J., said: `Municipal corporations are agents of the state, invested with certain subordinate governmental functions for reasons of convenience and public policy. They are created, governed, and the extent of their powers determined by the legislature, and subject to change, repeal, or total abolition at its will. They have no vested rights in their offices, their charters, their corporate powers, or even their corporate existence. This is the universal rule of constitutional law, and in no state has it been more clearly expressed and more uniformly applied than in Pennsylvania.' See also Shirk v. Lancaster, 313 Pa. 158, 162, 169 A. 557." Accord: Cleaver v. Board of Adjustment, 414 Pa. 367, 200 A. 2d 408; Schultz v. Philadelphia, 385 Pa. 79, 83, 122 A. 2d 279; White Oak Borough Authority Appeal, 372 Pa. 424, 427, 93 A. 2d 437; Genkinger v. New Castle, 368 Pa. 547, 549, 84 A. 2d 303; Philadelphia v. Fox, 64 Pa. 169, 180-181.
It is equally true that in its private or proprietary capacity a municipality is subject to the same duties and obligations as is a private corporation. Said the Court in Commonwealth v. PRT, 287 Pa. 70, 134 Atl. 452, at page 76: "Our cases are numerous in which it has been held that, where the municipality is not engaged in public business, it acts as do others likewise engaged, and is subject to the same duties and obligations *407 as to its contracts and the responsibility for the acts of those employed by it: [citing cases]." In that particular case, the Court held that the City was engaged in its private or proprietary capacity, and not in its public or governmental capacity, in the operation of transit facilities leased to PRT.

Declaratory Judgment Proceedings
2. A declaratory judgment proceeding is not a proper remedy and cannot be granted in this case because both the majority of this Court and the Court below reform the Option and grant SEPTA, contrary to the clear and express terms of the Option, the right to make payment and settlement within a period of not less than six months after the final disposition of this case, in lieu of the time period expressly and specifically required by the Option: Baskind v. National Surety Corp., 376 Pa. 13, 16, 101 A. 2d 645. Cf. also McWilliams v. McCabe, 406 Pa. 644, 657-8, 179 A. 2d 222.
The proper remedy in this case, assuming that the City and SEPTA wish to exercise whatever rights either possesses, would be (a) a bill in equity for specific performance, which could include an extension of the time for settlement, or (b) condemnation by eminent domain.
For the aforesaid reasons, I would reverse the judgment and the Order of the lower Court and dismiss the petition for a declaratory judgment.
Assuming arguendo that SEPTA has the legal right to exercise the City's aforesaid options, and that a Declaratory Judgment proceeding will lie, I would construe the City's Option formula as follows:
First: SEPTA must assume the unfunded pension obligations of PTC. This subject was not covered in the Option or in any other part of the Agreements and *408 was never within the contemplation of the parties. Section 24 of the Act of August 14, 1963, P.L. 984, as amended, 66 P.S. § 2024, requires that SEPTA "shall recognize and be bound by existing labor union agreements where they exist between labor unions and transportation companies that are acquired, purchased, condemned or leased by the board." Moreover, these unfunded pension obligations have always been treated by PTC with the approval of the City and of the Pennsylvania Public Utility Commission as a current operating expense when actually paid. It is therefore fair, equitable and just that PTC's pension obligations be assumed by SEPTA. Cf. Pittsburgh v. Pa. P.U.C., 370 Pa. 305, 88 A. 2d 59; Re Uniform System of Accounts for Electric Corporations, 82 P.U.R. (NS) 161.
Furthermore, there is a stronger and even more compelling reason why SEPTA must assume the pension obligations. The City's Option provides in the clearest language that the City must pay the PRT stockholders (for all the Company's property, lock, stock and barrel) "an amount equal to ten (10) dollars per share for all then outstanding common stock of Company, and the amount of the then undistributed corporate surplus, if any, of Company." The Option makes it mandatory to pay the stockholders (an amount equal to) $10 a share  not $10 conditionally or subject to any deductions whatsoever  and in addition thereto the amount of said surplus, if any. If no undistributed corporate surplus exists or if the liabilities exceed the assets, the City under said Option must pay $10 per share, which, in no event, can be reduced by pensions or by any other liabilities real or assumed, vested or contingent. The Majority's interpretation, which would greatly reduce or completely eliminate said $10 per share, completely ignores and violates this clear provision of the Option and radically alters the terms of the City's Option.
*409 For these reasons, as well as for the reasons so ably set forth in Justice ROBERTS' Opinion, I specifically dissent to this part of the majority Opinion.
Second: Item (4) (d) of the purchase price formula (as used in this Option), namely, "and the amount of the then undistributed corporate surplus, if any, of Company [PTC]" is difficult to interpret. There is no designation of surplus on the books of PTC under the heading "undistributed corporate surplus" or "corporate surplus," or merely "surplus." The headings nearest thereto are carried on its books as "capital surplus" and "retained earnings." The meaning of "corporate surplus" is at times indefinite and uncertain and is dependent on the particular agreement or particular Act (as the case may be). However, I agree with the Opinion of the Majority to the extent that the prima facie intent and the general rule means "the corporate surplus shown on the balance sheet of the Company."
In Branch v. Kaiser, 291 Pa. 543, 549, 140 Atl. 498, 500 (1928), this Court followed and adopted the following general rule which was thus stated in Edwards v. Douglas, 269 U.S. 204, 214: ". . . The word `surplus' is a term commonly employed in corporate finance and accounting to designate an account on corporate books. . . . The surplus account represents the net assets of a corporation in excess of all liabilities including its capital stock. This surplus may be `paid-in surplus,' as where the stock is issued at a price above par. It may be `earned surplus', as where it was derived wholly from undistributed profits. Or it may, among other things, represent the increase in valuation of land or other assets made upon a revaluation of the company's fixed property. . . ."
Moreover, it is a matter of common knowledge that a corporation changes from time to time the carried or *410 book value of its corporate or capital surplus, and the methods or factors for determining the same, and further that the Federal Government or the State Government has at times employed a different formula for the ascertainment thereof. Consequently, I believe that "undistributed corporate surplus" means prima facie "book value," but that the various assets of the Company may be revalued and their actual value established by relevant and convincing evidence.
I believe and would hold that the "undistributed corporate surplus" means (a) PTC's retained earnings, and (b) its capital surplus as shown on the books of the Company at the date of settlement, or its actual capital surplus on that date as proved by a revaluation thereof.
DISSENTING OPINION BY MR. JUSTICE ROBERTS:
The majority opinion, as it frankly states, is merely a highlighting of the opinion of the court below; indeed the majority seems to adopt that opinion in toto. Of necessity, therefore, my disagreement must be with the source of this Court's opinion.
1. Perhaps the most inequitable aspect of the Court's disposition is its saddling PTC with the obligation of paying future pension rights due its retired employees, thereby depriving PTC's stockholders of approximately $17,000,000. As a result the amount they will actually receive for their stock will be considerably less than the $10 per share envisioned by the 1939 formula. Indeed the amount required to meet the pension fund obligation is practically equal to the amount received in exchange for PTC's stock. Thus the effect of the disposition on this aspect is to wipe out entirely Item 3 of the option formula.
Yet in choosing to exercise its option, SEPTA is obligated to take over PTC as an operating transportation *411 system in its entirety. Logically this ought to include PTC's pension obligation. "Pensions are wages and constitute a present benefit, and therefore upon the establishment of a pension plan, whether based on past or future services, or both, the entire charge becomes an operating expense not an income deduction or a charge to surplus." Re Uniform System of Accounts for Electric Corporations, 82 P.U.R. (NS) 161 (N.Y. 1950). In Pittsburgh v. Pennsylvania Public Utility Comm'n, 370 Pa. 305, 88 A. 2d 59 (1952), this Court held that the burden of pension payments, including those attributable to past services, should be assumed by present and future ratepayers, rather than the stockholders. The following paragraphs from the Court's opinion seem to me to be equally applicable to the present case: "The Superior Court and the City of Pittsburgh rely upon the argument that a decision allowing the `freezing payment' places a burden on present and future ratepayers which should have been borne by those in the past. It is obvious, as the City argues and the Superior Court stated, that as a result of the Commission's decision present and future ratepayers must pay that portion of the cost of pensions which is more properly attributable to past services. But the criterion for determining whether present and future ratepayers or the investors in Bell should bear this portion of the cost is not whether past ratepayers should have paid it. If it were, it was illogical for the Superior Court to permit the Company to allow that portion of the pension costs attributable to services rendered between 1913 and 1927 since such costs should have been placed upon ratepayers between those years. Furthermore, even the ratepayers in 1913, by that test, should not have borne the amount which was paid out in pensions on a pay-as-you-go basis and which was attributable to services rendered before 1913.
*412 "Reduced to its simplest terms, the situation is this. Pensions are now recognized as a proper operating expense. It is fundamental that in order to afford an adequate retirement program any pension plan must take into consideration past services of employes: Osborne et al. v. United Gas Improvement Co. et al., 354 Pa. 57, 63, 64, 46 A. 2d 208. Someone must pay for the pension costs properly attirbutable to past services. At the present time such costs can be placed upon present and future ratepayers or the investors in the Company. In the present situation the test for determining where the burden should be placed as between these two classes of individuals is whether management abused its discretion in 1927 by not placing the full cost on the ratepayers from that time on. If they did, the investors for whom they acted should bear the cost. If they did not, there is no valid legal objection to placing the burden on present and future ratepayers. Since we have already demonstrated it cannot properly be held that management abused its discretion in 1927, the costs of pensions including the freezing payment were correctly included by the Commission as an operating expense.
"The view which we take of this phase of the case is supported by ample authority. On the other hand, the contention of the City of Pittsburgh that these pension costs should be borne by the Bell stockholders is not supported by a decision of any court of last resort.. . ." 370 Pa. at 320-21, 88 A. 2d at 66-67. (Emphasis supplied and footnote omitted.)
PTC has always followed the normal procedure of treating its pension obligations as part of its current operating expense. Accordingly these obligations have been reflected in its current rate structure. For over twenty-five years this has been done with express knowledge and approval of the City of Philadelphia, *413 SEPTA's assignor, who during this entire period was represented on PTC's Board of Management. Moreover, PTC's handling of its pension obligation had the approval of the Pennsylvania Public Utilities Commission. It seems to me, therefore, to be totally irrelevant to the issue before us for SEPTA to suggest that if it had been in control of PTC's management, it would have made different arrangements in order to meet its pension obligation. Had SEPTA chosen to acquire PTC by means of condemnation, the price SEPTA would have paid would have included the value of PTC's past pension obligations. Metropolitan Transportation Authorities Act of 1963, P.L. 984, § 8, 66 P.S. § 2008(f) (24) (1) (iii). In exercising the option SEPTA is purchasing PTC "lock, stock, and barrel," and is obligated to purchase it as it is  not as it might have been.
In addition, SEPTA's failure to assume PTC's pension obligation is in conflict with the legislative intention set forth in the statute creating SEPTA, Metropolitan Transportation Authorities Act of 1963, P.L. 984, 66 P.S. § 2001 et seq. Section 24, 66 P.S. § 2024 provides that SEPTA "shall recognize and be bound by existing labor union agreements where they exist between labor unions and transportation companies that are acquired, purchased, condemned or leased." It is evident that the legislature was thus concerned with the welfare of the transportation companies' employees. The existing union agreement specifically provides that retired employees shall "continue to receive benefits in accordance with the provisions of the contracts which were in effect at the times of their respective retirements on pension." Yet, as the amicus brief points out, SEPTA can hardly be bound by this provision of the union contract, which it assumes on the settlement date, and at the same time insist that *414 retired employees look not to it, but to PTC, for their benefits.
Thus I believe the Court's treatment of the $17,000,000 pension obligation is doubly burdensome. First, it retroactively compels PTC to utilize past earnings in order to pay for future obligations. This is not only contrary to the manner which PTC, with the express approval of the City and the P.U.C., has in the past treated said obligations, but also contrary to the intent of the 1939 agreement itself. Secondly, since these pension obligations have always been met on a pay-as-you-go basis, it contravenes the legislative intention by unnecessarily depriving retired employees of the security of the fare-box.
2. Under the 1939 agreement, the purchase price of PTC's entire operations is to be determined in accordance with a four factor formula contained therein. The only dispute concerning this formula is the meaning of the term "undistributed corporate surplus." I am unable to agree with either SEPTA's definition, adopted by the Court, that undistributed corporate surplus means only the balance sheet figure described as retained earnings, or PTC's definition that the term means the excess of the fair valuation of all the assets over the liabilities plus capital stock, thus requiring all the assets to be valued prior to their inclusion in the formula.
PTC derives its position from the classic definition of corporate surplus in Edwards v. Douglas, 269 U.S. 204, 46 S. Ct. 85 (1925), and approved by this Court in Branch v. Kaiser, 291 Pa. 543, 549, 140 Atl. 498, 500 (1928): "The word `surplus' is a term commonly employed in corporate finance and accounting to designate an account on corporate books. But this is not true of the words `undivided profits.' The surplus account represents the net assets of a corporation in *415 excess of all liabilities including its capital stock. This surplus may be `paid-in surplus,' as where the stock is issued at a price above par. It may be `earned surplus', as where it was derived wholly from undistributed profits. Or it may, among other things, represent the increase in valuation of land or other assets made upon a revaluation of the company's fixed property." 269 U.S. at 214, 46 S. Ct. at 88.
While I have no quarrel with this definition, I believe that it is inapplicable in the present case because the entire purpose of the 1939 agreement was to establish a fixed formula which would permit the buyer to know the price he would have to pay at the time he exercised his option. Philadelphia v. Philadelphia Transp. Co., 386 Pa. 231, 239, 126 A. 2d 132, 135-36 (1956). A valuation proceeding after the option is exercised, as PTC urges, would defeat this purpose; hence I agree with the court below that "undistributed corporate surplus" is not a valuation but a balance sheet figure.
On the other hand, the conclusion that undistributed corporate surplus is limited to the retained earnings of PTC is a non sequitur. In my view, which incidentally is supported by the opinion of the court below, the purpose of the formula price was not only to permit the optionee to purchase the company at a known price but also to insure PTC's stockholders that in the event the option was exercised their equity in the corporation as the same appeared on the company's books would at least be returned to them. On its books, PTC has divided its stockholders' equity into three categories: (1) capital stock, for which the formula compensates the stockholders by requiring the purchaser to pay $10 per share for each outstanding share of stock; (2) retained earnings, for which, under the opinion of the court below, the stockholders are *416 compensated for by its inclusion in the term "undistributed corporate surplus"; (3) capital surplus, for which under the Court's determination the stockholders receive no compensation.
I can see no justification for giving SEPTA the capital surplus as a windfall. This account is not a recently created entry but has had the unchallenged acceptance and approval of both the City and the P.U.C. for more than a quarter of a century. Every advantage of a known certainty which is true about the retained earnings balance sheet figure is equally true about the capital surplus account. As the court below observed: "There was no fraud or deceit  either alleged or proved  in the way PTC kept its books. The essence of the formula price, as had been seen, is that it is a book price. SEPTA is therefore bound to accept PTC's books in computing the formula price."
Accordingly, I would hold that the term "undistributed corporate surplus" as used in the 1939 formula means PTC's retained earnings and capital surplus as reflected on its balance sheet at date of settlement.
3. Additionally, I am disturbed by the uncertainty generated by the Court's treatment of PTC's current cash and liabilities. All agree that under the agreement SEPTA will purchase PTC's cash as well as its other assets, and that PTC is liable for the excess of its current liabilities over and above its current cash. However, there is considerable uncertainty as to what the Court's disposition is with regard to PTC's current cash and liabilities. As I read the opinion of the court below, on the one hand, it permits PTC to pay its current liabilities before settlement date, thereby reducing the amount of cash transferable to SEPTA. Presumably, PTC could liquidate all its cash by satisfying as much of its current liabilities as the cash would cover. It is also possible for SEPTA *417 and PTC to make an arrangement so that SEPTA will assume the current liabilities to the extent of PTC's current cash account thus not necessitating PTC to dispose of its cash in a desperate effort to meet a settlement deadline. On the other hand, the court states that if for any reason no such agreement is made PTC remains responsible for any liabilities existing on settlement date even though in its cash account there is an amount which could theoretically be utilized to reduce current liabilities.
In my view this confusion, which is not necessary and could produce a most inequitable result, should, especially in view of the intensity of this litigation, be clarified. Under the Court's decree SEPTA has six months in which to raise the money to purchase PTC. Under these circumstances PTC might not know until settlement date whether or not SEPTA will actually secure the necessary funds to assume control of its operations, and it may be impossible for PTC to settle its current liabilities on such short notice. On the other hand, if SEPTA fails to purchase the company, PTC may find itself with an inadequate cash position with which to properly operate the transportation system. I see no problem in making it crystal clear that the current cash is to be applied to the payment of current liabilities. On the settlement date SEPTA should only receive that portion of current cash which is in excess of PTC's current liabilities, unless there is an agreement that SEPTA will assume an amount of current liabilities equal to the amount of current cash it obtains.
Mr. Justice O'BRIEN joins in this dissenting opinion.
NOTES
[*] Italics throughout, ours.